**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

BILLY WILKERSON; *et al.*,        )
                                      )
        Plaintiffs,        )
                                      )
v.                           ) CASE NO. 1:10-cv-00201-KD-C
                                      )
TRANSOCEAN HOLDINGS, INC.;    )
 *et al.*,                          )
                                      )
        Defendants.      )

## <u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF<br>THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINT</u>

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), BP America Inc., BP Exploration and Production, Inc., and BP Products North America Inc. (collectively "BP Defendants") move to dismiss the Complaint.

In this purported class action, Plaintiffs, who "derive substantial income from…harvesting various types of seafood from Gulf Waters," and the owner of a seafood processing facility, (Compl. ¶ 5-11), assert negligence, wantonness, nuisance, and strict liability claims against Defendants in which they seek damages incurred "as a result of the oil spill that resulted from the explosion and fire aboard, and subsequent sinking of, the oil rig Deepwater Horizon" on April 20, 2010 (Compl. ¶ 1).   Nowhere in the Complaint do Plaintiffs address the requirements of the Oil Pollution Act of 1990 (OPA), 33 U.S.C. §2701, *et*. *seq*., or the claims process established by BP to comply with OPA's mandates.   Absent from Plaintiffs' Complaint is any allegation that they have submitted claims to the OPA-mandated and BP-administered claims process for the damages it allegedly incurred. These omissions are fatal to Plaintiffs' Complaint.

Plaintiffs' Complaint must be dismissed on the ground that OPA displaces Plaintiffs' negligence, wantonness, nuisance, and strict liability claims.  And, pursuant to OPA, as a mandatory condition precedent to filing a lawsuit against BP for recovery of damages related to the oil spill, a potential litigant must first present its claims to BP through the OPA-mandated claims process that BP is carrying out.  33 U.S.C. §2713(a), (c).  Failure to do so is both a jurisdictional defect and a failure to state a cause of action given that OPA's presentment requirement is an indispensable prerequisite to bringing suit.

Even if OPA had not displaced Plaintiffs' negligence, wantonness, nuisance, and strict liability claims, they would still be barred by the economic loss rule of *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 309 (1927), or Louisiana state law principles, *see PPG Indus., Inc. v. Bean Dredging*, 447 So. 2d 1058, 1062 (La. 1984), made part of the federal law governing the Outer Continental Shelf.  Both *Robins Dry Dock* and similar state doctrine made applicable by federal statute bar recovery of economic losses where, as here, there is not a physical injury to a proprietary interest.

## BACKGROUND

**I.    The Deepwater Horizon Incident**

The Deepwater Horizon drilling rig was owned and operated by Transocean Ltd. and/or its affiliates.  (Compl. ¶ 21.)  BP did not and does not own or operate the Deepwater Horizon. BP hired Transocean to use the Deepwater Horizon to drill an exploration well on the seabed at Mississippi Canyon Block 252 ("MC252"), which is located in the Gulf of Mexico approximately 130 miles southeast of New Orleans, and 50 miles southeast of Venice, Louisiana. (*See* Compl. ¶¶ 1, 21-22.)  On April 20, 2010, a fire and explosion occurred onboard the Deepwater Horizon.  (*Id*. at ¶ 1.) The rig sank on April 22, 2010. Following this incident, the well began to spill oil.  (*Id*. at ¶ 1.)  An extensive spill response operation was activated.  (*See* Deepwater Horizon Unified Command Home Page, http://www.deepwaterhorizonresponse.com.)

**II.      The Oil Pollution Act Claims Process Instituted By BP**

The Oil Pollution Act of 1990, among other things, requires a "responsible party" for a

vessel or a facility from which oil is discharged to pay specified removal costs and damages.  33

U.S.C. §2702.  OPA specifies, with certain exceptions not applicable here, that "all claims for

removal costs or damages *shall* be presented first to the responsible party" before the claimant

may pursue such costs or damages in court.  *Id*. at §2713(a) (emphasis added).  If the claim is not

resolved to the claimant's satisfaction within 90 days, only then may the claimant "elect to

commence an action in court against the responsible party . . . or to present the claim to the [Oil

Spill Liability Trust] Fund" established by the statute.  *Id*. at §2713(c).  Any claims paid by the

Fund may in turn be charged back to the responsible party.  *See id*. at §2712(f).

OPA permits harmed parties to recover the following categories of damages from a

"responsible party":  (a) destruction of, loss of, or loss of use of, natural resources; (b) damages

for injury to, or economic losses resulting from the destruction of, real or personal property; (c)

damages for loss of subsistence use of natural resources; (d) loss of revenue due to the injury,

destruction, or loss of real property, personal property, or natural resources; (e) loss of profits or

impairment of earning capacity due to the injury, destruction, or loss of real property, personal

property, or natural resources; and (f) damages for the costs of providing increased public

services during or after removal activities.  *Id*. at §2702(b)(2).

BP Exploration and Production, Inc. ("BPXP") was designated a "responsible party" by

the United States Coast Guard, and it  has accepted this designation, committing to paying for all

legitimate claims for damages covered by OPA resulting from the Deepwater Horizon incident.

(*See* BP Home Page, http://www.bp.com (follow "Gulf of Mexico response," then follow "How

to make a claim") (last visited June 23, 2010), screen shot attached hereto as Exhibit 1.)[1]  BPXP

---

[1]  BP requests that the Court take judicial notice of the fact that the existence of BPXP's OPA
claims process is apparent from the cited websites.  *See Marsh v. Butler County,* 268 F.3d 1014,

has instituted a claims process to fulfill its obligations as a designated "responsible party" under

OPA.  Information about BP's claims process can be found on BP's website.  (*See id*.)  BP has

established a toll-free hotline at 1-800-440-0858 accessible twenty-four hours a day, seven days

a week that claimants can use to file their claims.  (*See id*.)  Claimants may also submit their

claims online, or choose to work with adjusters working in over 25 regional BP claim center

offices opened in communities along the U.S. Gulf Coast, including many located in Alabama.

(*See id*.)  A copy of the BP claims process manual is available on BP's web site.  (*See id*. (follow

"Gulf of Mexico response," then follow "How to make a claim," then follow "BP claims process

(pdf, 216KB) hyperlink) (last visited June 23, 2010).)

The United States Coast Guard website provides information on the types of claims that

may be submitted under the Oil Pollution Act.  (*See* United States Coast Guard Oil Spill Claims

Home Page, http://www.uscg.mil/npfc/claims (last visited June 23, 2010), screen shot attached

hereto as Exhibit 2).  Further, a Unified Command was established to manage response

operations relating to the April 20, 2010 Deepwater Horizon incident that includes BP,

Transocean, the Coast Guard, the National Oceanic and Atmospheric Administration and other

federal agencies.  (*See* Deepwater Horizon Unified Command Home Page,

http://www.deepwaterhorizonresponse.com (last visited June 23, 2010), screen shot attached

hereto as Exhibit 3.)  The website for the Unified Command provides information on BP's OPA

claims process.  (*See id*.)  The White House and other federal government websites dedicated to

the Deepwater Horizon incident also provide information about BP's claims process.  (*See* The

White House Deepwater BP Oil Spill Home Page, http://www.whitehouse.gov/deepwater-bp-oil-

---

1049 n.3 (11th Cir. 2001) (taking judicial notice of the location of a city, highway, and business after referencing their locations on the Mapquest internet site)*; Mawulawde v. Bd. of Regents of the Univ. Sys. of Ga*., No. CV 105-099, 2007 WL 2460774, at *8 n.10 (S.D. Ga. Aug. 24, 2007) (taking judicial notice of a state medical college website "which constitutes a matter of public record") (citing Fed. R. Evid. 201(b)(2); collecting cases).  For the Court's convenience, we have included screen shots of the cited websites as exhibits in addition to the textual citations.

spill (last visited June 15, 2010), screen shot attached hereto as Exhibit 4; *see also* Disaster

Assistance Home Page, http://www.disasterassistance.gov (last visited June 23, 2010), screen

shot attached hereto as Exhibit 5.)

As of June 21, 2010, over 65,000 claims have been filed, and more than 32,000 payments

have been made, totaling over $105 million.  (*See* BP Home Page, http://www.bp.com (follow

"Press," then "Press releases") (last visited June 23, 2010), screen shot attached hereto as Exhibit

6.)  In addition, as of June 4, 2010, BP began sending out a second advance payment to

individuals and businesses along the Gulf coast to compensate for the loss of income or net profit

due to the cleanup of the Deepwater Horizon incident.  (*See* BP Home Page, http://www.bp.com

(follow "Press," then "Press releases") (last visited June 23, 2010), screen shot attached hereto as

Exhibit 7.)  BP estimates it will have spent $84 million for loss of income or net profit through

June, based on the claims it has received to date.  (*See id*.)

## III.    Plaintiffs' Complaint Allegations

Plaintiffs in this case allege causes of action for negligence, wantonness, nuisance and

strict liability.  (*See* Compl. ¶¶ 41-57.)  Nowhere in the Complaint do Plaintiffs allege that they

have presented their claims to the OPA-mandated and BP-administered claims process, allowed

BP to either accept or deny the claims, or even allowed 90 days to elapse before Plaintiffs filed

this case on April 30, 2010.

## ARGUMENT

Plaintiffs' claim should be dismissed pursuant to Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6).  Under Federal Rule of Civil Procedure 12(b)(1), the court may dismiss a

claim for lack of subject matter jurisdiction on "any of three separate bases:  (1) the complaint

alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the

complaint supplemented by undisputed facts plus the court's resolution of disputed facts."

*Rance v. D.R. Horton, Inc.*, 316 Fed. Appx. 860, 862 (11th Cir. 2008) (quoting *McElmurray v.*

5

*Consol. Gov't of Augusta-Richmond County*, 501 F.3d 1244, 1251 (11th Cir. 2007)).  Under

Federal Rule of Civil Procedure 12(b)(6), "a claim may be dismissed when a plaintiff fails to

allege any set of facts in support of his claim which would entitle him to relief."  *See Magluta v.*

*Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).  Conclusory allegations and legal conclusions

will not suffice to prevent a motion to dismiss.  *See Watts v. Florida Int'l Univ.*, 495 F.3d 1289,

1295 (11th Cir. 2007).  In cursory fashion, Plaintiffs assert negligence, wantonness, nuisance,

and strict liability claims for which they seek recovery of economic losses.  (Compl. ¶¶ 30, 41-

57.)

      Plaintiffs' claims must be dismissed because OPA displaces Plaintiffs' negligence,

wantonness, nuisance, and strict liability claims.  Even absent displacement by OPA, Plaintiffs'

negligence, wantonness, nuisance and strict liability claims cannot survive because recovery in

tort for economic losses is barred pursuant to the rule of *Robins Dry Dock* and federally

incorporated Louisiana law.

**I.**    **Plaintiff's Negligence, Wantonness, Nuisance, And Strict Liability Claims Must Be Dismissed Because They Are Displaced By OPA.**

    **A.**    **The OPA Presentment Requirement Is A Mandatory Condition Precedent To Filing A Lawsuit Against The BP Defendants.**

      OPA provides that any prospective plaintiff must first present all its claims for damages

resulting from the oil spill stemming from the Deepwater Horizon incident to BP before any

lawsuit is filed.  In relevant part, OPA provides that "***all claims*** for removal costs or damages

***shall be presented first to the responsible party*** or guarantor of the source designated under

section 2714(a) of this title."  33 U.S.C. §2713(a) (emphasis added).  ***A suit may only be***

***initiated*** <u>***after***</u> ***a claim is presented in accordance with 2713(a)***, *and the responsible party denies*

*all liability for the claim or the claim is not settled by payment within 90 days after the date upon*

*which the claim was presented.*  33 U.S.C. §2713(c) (emphasis added).  Plaintiff does not allege

that he has complied with this OPA-mandated claims presentment requirement.

In light of OPA's statutory "presentment" requirement, a court may not entertain damages claims against the BP Defendants "***unless and until*** a claimant has presented her claims in compliance with §2713(a)."  *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*, 51 F.3d 235, 240 (11th Cir. 1995) (emphasis added); *see also Turner v. Murphy Oil USA, Inc.*, No. 05-4206, 2007 WL 4208986, at *2 (E.D. La. Nov. 21, 2007) (dismissing OPA claims for lack of jurisdiction because plaintiffs failed to follow the presentment requirement); *Abundiz v. Explorer Pipeline Co.*, No. Civ.A. 300CV2029H, Civ.A. 303CV0508H, Civ.A. 303CV0787H, 2003 WL 23096018, *5 (N.D. Tex. Nov. 25, 2003) (same).

The OPA claims process is, in other words, "a mandatory condition precedent" to pursuing OPA claims in court.  *Boca Ciega*, 51 F.3d at 240; *Gabarick v. Laurin Maritime (Am.) Inc.*, Civil Action No. 08-4007, 2009 WL 102549, at *3 (E.D. La. Jan. 12, 2009).  "[T]he clear text of §2713 creates a mandatory condition precedent barring all OPA claims unless and until a claimant has presented her claims in compliance with §2713(a)…"  *Boca Ciega*, 51 F.3d at 240.  Thus, courts dismiss lawsuits brought under OPA where the plaintiffs have not followed §2713's presentment requirements.  *Id.*; *Marathon Pipe Line Co. v. LaRoche Indus., Inc.*, 944 F. Supp. 476, 477 (E.D. La. 1996) ("The Court agrees that §2713's presentation requirement is jurisdictional and mandates dismissal when that provision is applicable and not complied with by the claimant").

Congress instituted the mandatory OPA claims process and presentment requirement to encourage the resolution of claims arising from an oil spill without getting the courts involved.  As Representative Hammerschmidt explained in urging passage of OPA, "[t]he system of liability and compensation provided for in the bill . . . *is intended to allow for quick and complete payment of reasonable claims without resort to cumbersome litigation.*"  135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989) (emphasis added); *see also* 135 Cong. Rec. H7962 (daily ed. Nov. 2, 1989) (statement of Rep. Lent) ("The thrust of this legislation is to eliminate, to the extent

7

possible, the need for an injured person to seek recourse through the litigation process."); *Boca Ciega*, 51 F.3d at 238-39 (OPA seeks "to encourage settlement and avoid litigation").

As detailed above, BP has provided notice advising parties desiring to assert an OPA claim that they may file and present their claims either at a claims center set up specifically to address OPA claims, by calling a toll free telephone number provided by BP, or by submitting their claims online.  Despite this notice, Plaintiffs do not allege that they have complied with OPA by first presenting their claim to BP's claims process.  Further, even if a claim is presented as required by OPA, there is a 90 day time period for BP to settle or deny the claim.  33 U.S.C. §2713(c).  Any lawsuit filed against the BP Defendants before the 90 days lapses would therefore be premature.[2]

> **B.**     **OPA Displaces Plaintiff's Claims For Negligence, Wantonness, Nuisance, And Strict Liability.**

Absent OPA, Plaintiffs' negligence, wantonness, nuisance and common law strict liability claims would be governed by the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§1349(b)(1)(A), or federal maritime law.  However, OPA has displaced the area of federal common law and maritime law applying to oil spills.  Accordingly, Plaintiffs' Complaint

---

[2] This is not just BP's view of the law.  Indeed, in a brief filed on June 8, 2010, before the Judicial Panel On Multi-District Litigation opposing MDL consolidation of actions relating to the Deepwater Horizon incident, a seafood company which voluntarily dismissed an action it had filed in the federal district court for the Southern District of Mississippi acknowledged the import of OPA's mandatory presentment requirement:  "However, none of the underlying Complaints alleged or have complied with the mandatory conditions precedent of presentment of claims to BP before initiating the underlying litigation.  As a result, all underlying Complaints upon which these motions for transfer, coordination or consolidation are based, were prematurely filed and must be dismissed against BP as to any claims under the OPA, and cannot serve as a basis for transfer, coordination and consolidation for MDL proceedings."  (*See* Exhibit 8, a copy attached hereto of Potential Interested Party's Response In Opposition To Motions For Transfer, Coordination And Consolidation Pursuant to 28 U.S.C. §1407 without exhibits filed 6/8/07 in MDL Docket No. 2179.)  While BP advocates MDL consolidation and disagrees that OPA's presentment requirement counsels against such coordination, this former plaintiff accurately summarizes the implication of OPA's presentment requirement for lawsuits such as this where the Plaintiffs have not fulfilled the OPA claims presentment requirements.

must be dismissed as displaced by OPA, and as premature in any case in light of Plaintiffs'

failure to comply with OPA's mandatory presentment requirement.[3]

If OPA did not exist, either federal law pursuant to OCSLA (which governs the leasing of

subsea resources and other matters not relevant here) or federal maritime law would apply to

Plaintiffs' claims for negligence, wantonness, nuisance and strict liability.  Pursuant to OCSLA,

"[e]xcept as provided in subsection (c)" of OCSLA Section 1349, which does not apply here,

"the district courts of the United States shall have jurisdiction of cases and controversies arising

out of, or in connection with (A) any operation conducted on the outer Continental Shelf which

involves exploration, development, or production of the minerals, of the subsoil and seabed of

the outer Continental Shelf, or which involves rights to such minerals…"  43 U.S.C.

§§1349(b)(1)(A).  As the Court has explained, "[a]ll law applicable to the Outer Continental

Shelf is federal law, but to fill the substantial 'gaps' in the coverage of federal law, OCSLA

borrows the 'applicable and not inconsistent' laws of the adjacent States as surrogate federal

law."  *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 480-81 (1981) (quoting 43 U.S.C. §

1333(a)(2); *Rodrigue v. Aetna Cas. Co.,* 395 U.S. 352, 355-59 (1969)); *see also Roach v. M/V

Aqua Grace*, 857 F.2d 1575, 1580 (11th Cir. 1988) ("Congress has legislatively established the

applicability of an adjacent state's law to actions arising on the outer continental shelf.") (citing

43 U.S.C. § 1333(a)(2)).  In assessing admiralty jurisdictions, courts examine locality and nexus

with maritime activity.  *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513

---

[3] The argument here is advanced in the alternative.  If the Court agrees, per *Marathon Pipeline*,
that failure to comply with the OPA presentment requirement constitutes a jurisdictional defect,
then under the Supreme Court's *Steel Company* case and its progeny, the Court can grant this
motion to dismiss without proceeding further to address the full range of issues covered in
Section II.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-98 (1998) (Article III
courts must decide questions of jurisdiction before proceeding to questions concerning the
propriety of causes of action).  Instead, if the Court holds that OPA displaces other federal non-
statutory remedies and that the OPA presentment requirement is a prerequisite to pursuing an
OPA cause of action that has not been complied with, then a dismissal is mandatory and the
Court does not even need to consider in any fashion issues related to the Outer Continental Shelf
Lands Act.

U.S. 527, 533 (1995).  Federal maritime law applies in admiralty cases.  *Marine Transp. Servs. Sea-Barge Group, Inc. v. Python High Performance Marine Corp.*, 16 F.3d 1133, 1139 n.8 (11th Cir. 1994).  This is true regardless of the jurisdictional grounds pled in the complaint.  *See* Fed. R. Civ. P. 9(h) ("A claim cognizable only in the admiralty or maritime jurisdiction is an admiralty or maritime claim for those purposes, whether or not so designated.").

OPA has displaced Plaintiffs' claims for negligence, wantonness, nuisance and strict liability because OPA occupies the federal field of responding to oil spills on the waters of the United States.  Federal common law is "subject to the paramount authority of Congress."  *New Jersey v. New York*, 283 U.S. 336, 348 (1931).  It is resorted to in absence of an applicable Act of Congress and because the Court is compelled to consider federal questions which cannot be answered from federal statutes alone.  *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367 (1943).  However, "when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears."  *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 314 (1981).  When the question arises of whether federal statutory or federal common law governs, "we start with the assumption that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law."  *Id*. at 317.  Indeed, "the very concerns about displacing state law which counsel against finding pre-emption of *state* law in the absence of clear intent actually suggest a willingness to find congressional displacement of *federal* common law."  *Id.*[4]

When Congress has engaged in comprehensive rulemaking in particular fields previously governed by federal common law, the Court has found that Congress has displaced federal

---

[4]  In discussing whether federal common law has been displaced, certain courts have referred to this issue as one of "preemption."  However, displacing federal common law does not present any of the federalism concerns normally associated with preemption, and this inquiry is solely focused on OPA's effect on preexisting *federal* law.

common law.  In *City of Milwaukee*, for example, the Court found that the Clean Water Act displaced the federal common law of interstate water pollution.  *Id.* ("Congress has not left the formulation of appropriate federal standards to the courts through application of often vague and indeterminate nuisance concepts and maxims of equity jurisprudence, but rather occupied the field through the establishment of [the Clean Water Act]…"); *see also Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1 (1981) (holding that the Federal Water Pollution Act displaced federal common law of nuisance in the area of ocean pollution); *U.S. v. Dixie Carriers, Inc.*, 627 F.2d 736, 740-41 (5th Cir. 1980) (holding that the Federal Water Pollution Control Act would provide the exclusive legal remedy for government to recover its oil spill cleanup costs).

Similarly, the Court found that the Death on the High Seas Act displaced general maritime law for those issues covered under the Act.  *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978) (The Act "announces Congress' considered judgment," and while it does not address every issue of wrongful-death law, "when it does speak directly to a question…courts are not free to 'supplement' Congress' answer so thoroughly that the Act becomes meaningless").  Under this reasoning, the *Mobil* court declined to provide damages for "loss of society" under general maritime law when Congress had not provided for such damages in the Death of the High Seas Act.  *Id.*; *see also Miles v. Apex Marine Corp.*, 498 U.S. 19, 31-33 (1990) (declining to supplement the damages provisions of the Death of the High Seas Act); *CEH, Inc. v. F/V Seafarer*, 70 F.3d 694, 701 (1st Cir. 1995) (holding that *Miles* dictates deference to congressional judgment "where, at the very least, there is an overlap between statutory and decisional law").

Following the Exxon Valdez oil spill, Congress passed the Oil Pollution Act of 1990.  *See* U.S.C. §§2701, *et seq.*  Courts have routinely recognized the comprehensive nature of OPA.  *See, e.g,. Targa Midstream Servs. Ltd. P'ship v. K-Sea Transp. Partners, L.P.*, No. Civ.A. G-05-

11

629, 2006 WL 2520914, at *2 (S.D. Tex. Apr. 20, 2006) ("OPA created a stricter and more comprehensive liability scheme for oil spill pollution than had existed under prior legislation…"); *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) ("OPA 'represents Congress' attempt to provide a comprehensive framework in the area of marine oil pollution'") (*citing Rice v. Harken Exploration Co.*, 89 F. Supp. 2d 820, 822 (N.D. Tex. 1999)); S. REP. NO. 101-94, U.S. Code Cong. & Admin. News 1990, pp. 722, 730 (OPA "creates a single federal law providing clean up authority, penalties, and liability for oil pollution").

OPA is the exclusive federal remedy for any public or private claimant seeking recovery for damages suffered as a result of an oil spill. *See* 33 U.S.C. § 2702(a). Section 2702(a) states:

> (a) In general
>
> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

*Id.* at §2702(a) (emphasis added). OPA Section (b)(2) specifies the covered damages, and includes damages to (A) natural resources, (B) real or personal property, (C) subsistence use; (D) revenues; (E) profits and earning capacity; and (F) public services. OPA Section 2713(a) details the mandatory and exclusive nature of claims for damage as a result of oil spills: "***all*** claims for removal costs or damages ***shall be presented first*** to the responsible party…" (emphasis added). Section 2713(c) specifies that suit in federal court is ***only*** appropriate after a claim is presented to a responsible party and the responsible party denies the claim or the claim is not settled by any person by payment within 90 days after the claim was presented.

Here, Plaintiffs allege damages squarely covered by OPA. Plaintiffs assert "[t]he oil spill and the contamination have caused and will continue to cause loss of revenue to persons and

businesses who are being prevented from using the Gulf of Mexico Alabama's adjoining beaches for diverse activities, including work and to earn a living." (Compl. ¶ 30.)

While the text of OPA is not without limitations, these limitations provide that OPA shall not be construed as "preempting[] the authority of any State…from imposing any additional liability," nor to affect the authority of the United States or any State or political subdivision thereof to impose additional liability or to impose any fine or penalty for any violation of law. 33 U.S.C. §2718(a). These limitations, however, do not affect whether OPA displaces preexisting federal common law that adopts state law as a measure to fill "gaps."

Indeed, courts have found that "Congress intended the OPA to be the ***exclusive*** federal law governing oil spills." *South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000) (emphasis added) (holding that punitive damages were not available under OPA because "Congress's very specific treatment of oil pollution in the OPA, which does not provide for punitive damages, supplanted general admiralty and maritime law, which has traditionally provided for the general availability of punitive damages for reckless conduct"); *see also Tanguis*, 153 F. Supp. 2d at 867 ("This new scheme includes new remedies, which, in many respects, preempt traditional maritime remedies"); *Gabarick v. Laurin Maritime (Am) Inc.*, 623 F. Supp. 2d 741, 750-51 (E.D. La. 2009) (holding that all general maritime law claims that are recoverable under OPA are preempted by OPA); *National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1447 (E.D. Va. 1996) ("OPA clearly preempts maritime law as to recovery of cleanup expenses and the cost of compensating injured persons").

Thus, OPA displaces Plaintiffs' negligence, wantonness, nuisance, and common law strict liability claims.

**II.      Even If OPA Did Not Displace Plaintiffs' Claims For Negligence, Wantonness, Nuisance, and Strict Liability, Any Such Claims Are Barred By The Economic Loss Rule.**

Even absent OPA, Plaintiffs' negligence, wantonness, nuisance, and common law strict liability claims are barred by the economic loss rule which prohibits recovery for economic losses where there is no physical injury to a proprietary interest.  This is the case regardless of whether OCSLA or maritime law applies to Plaintiffs' negligence, wantonness, nuisance, and strict liability claims.

In the event OPA displacement did not exist and OCSLA was applied to interpret Plaintiffs' negligence, wantonness, nuisance, and strict liability claims, the Court would apply as federal law the civil laws of Louisiana, which has adopted the economic loss rule.  Under OCSLA, "To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations …the civil and criminal laws of each adjacent State …are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon."  43 U.S.C. §1333(a)(2)(A); *see also Texaco Exploration And Prod., Inc.*, 448 F.3d at 772 (addressing 43 U.S.C. §1333(a)(2)(A)).[5]  Louisiana state law generally prohibits the recovery of purely economic damages without accompanying physical damage to a proprietary interest even as to

---

[5] There are "four types of evidence" that a district court should consider in determining which state is adjacent to an OCS location, namely "(1) geographic proximity; (2) which coast federal agencies consider the subject platform to be 'off of'; (3) prior court determinations; and (4) projected boundaries."  *Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521, 524 (5th Cir. 2000).  With regard to Mississippi Canyon 252, where the incident occurred, Louisiana is geographically closer than any other Gulf Coast state.  (*See* Exhibit 9.)  Importantly, federal district courts have concluded that OCS locations within the Mississippi Canyon field are adjacent to the State of Louisiana and have thus applied Louisiana law as surrogate federal law. *See e.g.*, *Ronquille v. MMR Offshore Services, Inc.*, 353 F.Supp.2d 680 (E.D.La. 2004) (Mississippi Canyon Block 809); *Dennis v. Bud's Boat Rental, Inc.*, 987 F.Supp. 948 (E.D.La. 1997) (Mississippi Canyon Block 20).  Lastly, if the state boundary between Louisiana and Mississippi were projected seaward, the incident would be located on the Louisiana side of that theoretical boundary.  Thus, the State of Louisiana is adjacent to the accident site, and its laws may govern certain claims arising from the incident absent applicable federal law or any inconsistencies between Louisiana law and federal law.

commercial fishermen.  *See Phillips v. G&H Seed Co.*, 10 So. 3d 339, 441-44 (La. Ct. App. 2009) (disallowing recovery for economic damages to buyers and processors of crawfish who had contracts with a commercial crawfish farm whose crop was damaged by defective rice seed); *Louisiana Crawfish Producers Ass'n-West v. Amerada Hess Corp.*, 935 So. 2d 380, 385 (La. Ct. App. 2008) (disallowing recovery for economic damages to commercial crawfishermen who claimed that oil and gas exploration activities had damaged their fishing grounds); *PPG Indus., Inc. v. Bean Dredging*, 447 So. 2d 1058, 1062 (La. 1984) (disallowing recovery of economic losses of downstream users of gas from a damaged pipeline); *see also Barasich v. Shell Pipeline Co., LP*, Civil Action Nos. 05-4180, 05-4197, 05-4199, 05-4212, 05-4512, 06-5102, 2006 WL 3913403, at *7 (E.D. La. Nov. 20, 2006) (holding commercial fisherman "who did not sustain physical damages to their property lack standing to sue under either federal or state law").

In the event OPA displacement did not exist and federal maritime law was applied to Plaintiffs' negligence, wantonness, nuisance, and strict liability claims, Plaintiffs' claims would likewise be barred by the economic loss rule.  The Eleventh Circuit has adopted the bright-line rule set forth by the United States Supreme Court in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 309 (1927), which bars recovery for general maritime law tort claims for purely economic losses absent physical injury to a proprietary interest.  *See Kingston Shipping Co., Inc. v. Roberts*, 667 F.2d 34, 35 (11th Cir. 1982) (applying *Robins Dry Dock* to affirm dismissal of negligence claims alleging purely economic damages, and rejecting attempts to question the rule's validity)*; see also Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1031-32 (5th Cir 1985) (en banc) (affirming summary judgment in favor of defendants pursuant to *Robins Dry Dock* where boat operators, seafood enterprises, tackle and bait shops, and recreational fishermen brought general maritime claims seeking purely economic damages resulting from chemical spill).  To the extent Plaintiffs are alleging public nuisance by claiming that the "nuisance created by Defendants caused special damages to Plaintiffs in which the public does

15

not participate," (Compl. ¶ 55) such claims are equally barred by the economic loss rule.  *See*
M/V TESTBANK, 752 F.2d at 1030-31 (suggesting that "Plaintiffs seek to avoid the *Robins* rule
by characterizing their claims as damages caused by a public nuisance," explaining that public
nuisance, at common law, involves damages "substantially greater than the presumed-at-law
damages suffered by the general public as a result of the nuisance," and concluding that
"plaintiffs may not recover for pure economic losses under a public nuisance theory in maritime
tort") (citations omitted); *Dick Meyers Towing Serv., Inc. v. U.S.*, 577 F.2d 1023, 1025, n.4 (5th
Cir. 1978) (stating that plaintiff's attempts to rephrase his claim for interference with his
business expectancies as a public nuisance claims did not change the claims character, thus the
claims were barred); *In re Exxon Valdez*, 767 F. Supp. 1509, 1517(D. Alaska 1991) (finding that
plaintiffs' common law claims, including nuisance claims, were barred by *Robins Dry Dock*).

Only one very narrow exception to the *Robins Dry Dock* rule has been recognized by
district courts in the Fifth Circuit for commercial fishermen who have established a course of
business conduct which makes commercial use of a public right in a specifically defined area are
entitled to pursue recovery for economic losses due to the tortious invasion of pollutants in that
area.  *Louisiana ex rel. Guste v. M/V TESTBANK,* 524 F. Supp. 1170, 1173-74 (E.D. La. 1981),
*aff'd,* 728 F.2d 748 (5th Cir. 1984), *aff'd on reh'g,* 752 F.2d 1019 (5th Cir. 1985) (en banc), *cert.
denied*, 477 U.S. 903 (1986).  The district court in *TESTBANK* acknowledged that such
commercial fishermen raised unique concerns regarding economic loss given that their
livelihoods depended on the use of public waters and that they have been favored in admiralty.
*Id*.  The court was careful to note that this narrow exception has not been expanded by other
courts that recognize it and would not be expanded by the district court either.  *Id*. at 1173, n. 4.
Indeed, the court dismissed the claims of the other plaintiffs, including:  those claiming shipping
interests; marina and boat rental operators; wholesale and retail seafood enterprises; seafood
restaurants; tackle and bait shops; recreational fishermen, oystermen, shrimpers, and crabbers;

and commercial fishermen, crabbers, oystermen, and shrimpers allegedly affected who did not

demonstrate they operated in the areas closed by the Coast Guard.  *Id*. at 1174; *see also, e.g.*, *In*

*re Complaint of Clearsky Shipping Corp.*, Nos. Civ.A. 96-4099, Civ.A. 96-4047, Civ.A. 96-

4048, Civ.A. 96-4077, Civ.A. 96-4090, Civ.A. 96-4097, Civ.A. 96-4098, Civ.A. 96-4193, Civ.A.

97-89, 1998 WL 42884, at *3 (E.D. La. Jan. 30, 1998) (declining to expand the *TESTBANK*

exception).

Further, if the Court chose to apply federal maritime law to Plaintiffs' claims, Plaintiffs'

common law strict liability claim would also be barred because, aside from strict product liability

claims, common law strict liability is not a recognized maritime law claim.  *See, e.g.*, *Maryland*

*Dep't of Natural Resources v. Kellum*, 51 F.3d 1220, 1228 (4th Cir. 1995) (finding that strict

liability could not be applied to general maritime tort cases because it altered substantive

maritime law, which traditionally required findings of fault, meaning that the imposition of strict

liability would deprive the parties of admiralty rights); *EAC Timberlane v. Pisces, Ltd.,* 745 F.2d

715, 721-22 (1st Cir. 1984) (affirming dismissal of strict liability claim where general maritime

law applied, noting that maritime law recognizes strict liability only for *products liability*

(manufacturing and design defects), not for conduct such as engaging in ultrahazardous activity);

*Great Lakes Dredge & Dock Co. v. City of Chicago*, No. 92 C 6754, 1996 WL 210081, at *5

(N.D. Ill. Apr. 26, 1996) (granting judgment on the pleadings on behalf of defendants, reasoning

that plaintiff's strict liability for abnormally dangerous activity claim was not recognized by

maritime law).

Plaintiff in this case seeks recovery for purely economic losses that they claim occurred

or will occur as a result of BP's alleged negligence, wantonness, or under a theory of common

law nuisance and strict liability.  (*See generally* Compl. ¶¶ 41-57.) Thus, even absent

displacement of Plaintiffs' causes of action by OPA, the negligence, wantonness, nuisance, and

strict liability claims would be barred by the economic loss rule.  Plaintiffs' attempts to couch

17

their requests for economic loss damages in these different theories of liability does not change that conclusion, regardless of whether OCSLA or maritime law applies to interpret the claims. In the event OCSLA applies, federal law would effectively apply Louisiana law, which makes no exception for commercial fisherman.

In the event maritime law applies, Plaintiffs do not meet the narrow exception to the *Robins Dry Dock* rule carved out by the Fifth Circuit district court in *TESTBANK*. The named Plaintiffs in this case allege only that they "derive[] substantial income from…harvesting various types of seafood from Gulf Waters," (Compl. ¶ 5-11) and they seek recovery for economic losses they allege occurred or will occur as a result of Defendants' negligence, wantonness, or under a common law theory of nuisance and strict liability. (*See generally* Compl. ¶¶ 41-57.) Plaintiffs do not allege facts establishing a course of business conduct in which it makes commercial use of a public right to fish—by license or otherwise—in any specifically defined areas allegedly damaged by the oil spill. Nor do Plaintiffs allege that some specific area in which they fish has been closed by the Coast Guard or damaged or that any such closure or damage occurred during the particular fishing season in which Plaintiffs operate. Instead, Plaintiffs broadly allege that oil from the Deepwater Horizon incident has caused detrimental affects to the Gulf of Mexico and is "threatening Alabama's beaches, and associated recreational areas" (Compl. ¶ 29) and that that they are being prevented from using the Gulf and Alabama's adjoining beaches for diverse activities (Compl. ¶ 30). Such overly general, unspecific allegations do not satisfy the narrow exception contemplated by the district court in *TESTBANK*. Likewise, the purported class definition asserted in Plaintiffs' complaint encompasses individuals and entities who would not fall within this exception.

Further, Plaintiffs' common law strict liability claim must be dismissed if maritime law applies because it is not recognized as a cause of action. Absent OPA displacement, Plaintiffs' claims for economic damages allegedly suffered as a result of Defendants' negligence,

wantonness, or under theories of common law nuisance and strict liability are barred and must be dismissed.

## CONCLUSION

For the above and foregoing reasons, Plaintiffs' Complaint should be dismissed for lack of jurisdiction or for failure to state a claim.  First, OPA displaces Plaintiffs' negligence, wantonness, nuisance and common law strict liability claims.  As a result, Plaintiffs' claims suffer from both a jurisdictional defect and a failure to state a cause of action, since compliance with the OPA presentment requirement is an indispensable prerequisite to bringing suit.  Second, even absent OPA, Plaintiff's negligence, wantonness, nuisance, and common law strict liability claims would be barred by the economic loss rule.

*s/ William H. Brooks*
John M. Johnson (JOHNJ7318)
Adam K. Peck (PECKA0851)
William H. Brooks (BROOW3330)
Marchello D. Gray  (GRAYM6384)
**LIGHTFOOT, FRANKLIN & WHITE, L.L.C.**
400 North 20th Street
Birmingham, Alabama  35203
Telephone:     (205) 581-0700
Facsimile:      (205) 581-0799
JJohnson@lightfootlaw.com
APeck@lightfootlaw.com
Wbrooks@lightfootlaw.com
MGray@lightfootlaw.com

Attorneys for Defendants
BP America Inc., BP Exploration and Production, Inc.,
and BP Products North America Inc.

OF COUNSEL:

Richard C. Godfrey, P.C.
John T. Hickey, Jr., P.C.
J. Andrew Langan, P.C.
**KIRKLAND & ELLIS, LLP**
300 North Lasalle Street
Chicago, IL 60654
Telephone:     (312) 862-2000

Facsimile:      (312) 862-2200
RGodfrey@kirkland.com
JHickey@kirkland.com
ALangan@kirkland.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of June, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

Robert T. Cunningham, Jr.,  Esq.
Steven L. Nicholas, Esq.
Steve Olen, Esq.
Lucy E. Tufts, Esq.
**CUNNINGHAM BOUNDS**, LLC
1601 Dauphin Street
Mobile, AL 36604

George R. Irvine, III, Esq.
**STONE, GRANADE & CROSBY**, P.C.
7133 Stone Drive
Daphne, AL 36526

John N. Leach, Esq.
Joseph P. H. Babington, Esq.
Russell C. Buffkin. Esq.
**HELMSING, LEACH, HERLONG,
NEWMAN & ROUSE, P.C.**
Post Office Box 2767
Mobile AL 36652

Donald E. Godwin, Esq.
Bruce W. Bowman, Jr., Esq.
Jenny L. Martinez, Esq.
**GODWIN RONQUILLO, P.C.**
1201 Elm Street, Suite 1700
Dallas, TX 75270

Robert Alan York, Esq.
**GODWIN RONQUILLO, P.C.**
1331 Lamar, Suite 1665
4 Houston Center
Houston, TX 77010

A. Danner Frazer , Jr., Esq.
Robert J. Mullican, Esq.
**FRAZER, GREENE, UPCHURCH &
BAKER LLC**
P. O. Box 1686
Mobile, AL 36633

David J. Beck, Esq.
**BECK, REDDEN & SECREST, LLP**
One Houston Center
1221 McKinney St., Ste 4500
Houston, TX 77010

Blane H. Crutchfield, Esq.
Douglas L. McCoy, Esq.
**HAND ARENDALL, L.L.C.**
P. O. Box 123
Mobile, AL 36601

                                        s/ *William H. Brooks*
                                             Of Counsel