## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**BILLY WILKERSON; et al.,**                         *

      **Plaintiffs,**                                  *

**v.**                                               *          **CASE NO. 1:10-cv-201-CB-N**

**TRANSOCEAN HOLDINGS, INC.,**                       *
**a corporation; et al.,**
                                        *

      **Defendants.**                                  *

                                        *

## BRIEF OF PLAINTIFFS IN OPPOSITION
## TO MOTIONS TO DISMISS OR FOR MORE DEFINITE STATEMENT

      BP,[1] Halliburton and Cameron have moved to dismiss for failure to state a claim upon which relief can be granted, and for lack of subject matter jurisdiction, or moved for a more definite statement. Their positions are similar enough that for the convenience of all, we reply by one single brief.

      The motions should properly be denied. The court does have subject matter jurisdiction, and plaintiffs here have valid claims under state law of its own force, under admiralty law of its own force, and under the Outer Continental Shelf Lands Act, which recognizes both admiralty and state law claims. And the claims are clear enough that a more definite statement is not mandated.

### I.    Background.

      BP, with various kinds of help from the other defendants, drilled a very deep oil well on the Outer Continental Shelf in the Gulf of Mexico. BP's "Initial Exploration Plan" which it filed

---

[1] For the sake of clarity and convenience all related entities are combined here. Service has not been perfected on BP plc. The Transocean Defendants have not yet responded to Plaintiffs' Complaint.

February 23, 2009 with what was then called the "Minerals Management Service"[2] said the well

would be at Latitude 28°44' 17.277 N, Longitude 88°21' 57.340 W, which is in the Gulf of Mexico

outside the boundaries of any state. BP eerily named this area the "Macondo Prospect." "Macondo"

is the name of the fictitious cursed town[3] in the bizarre novel *One Hundred Years of Solitude* by the

Nobel-prize winning Colombian writer Gabriel Garcia Marquez. MMS had a more boring[4] name

for the area, "Mississippi Canyon Block 252," which they abbreviated "MC252." The name wasn't

the only thing that was abbreviated at this well; so were the normal safety and technical procedures.

While the semi-submersible DEEPWATER HORIZON was working on the well, explosive

gases and crude oil under unimaginable pressure blasted up the well casing and the "riser" or pipe

from the seabed to the vessel and, as the well blew up, the rig caught on fire and exploded and sank.

At least eleven people were killed, and others hurt. Some or all of the normal processes and

protective devices in the subsoil, on the seabed, and on and about the vessel failed to abort this

tragedy. Vast volumes of crude oil and gas thereafter gushed out of the damaged well in an

unstoppable, unmeasured and unprecedented flow, damaging and destroying fish and birds and

shrimp and oysters, and the lives of a people who -- and in places which -- for generations had

lovingly lived on and enjoyed them. These massive eruptions from the well, in various states of

---

[2] On June 18, 2010, the Secretary of Energy by Executive Order renamed MMS the "Bureau of Ocean Energy Management, Regulation, and Enforcement," to be called "BOE." Maybe a week later the web site said that instead of "BOE," it was supposed to be "BOEMRE" [on The Street it has been puckishly suggested that the new acronym is pronounced "BUMMER"].

[3] In the novel, Macondo -- surrounded by water -- seems unable to escape terrible and mostly self-inflicted problems until finally the town is destroyed by a hurricane.

[4] We gather that the MMS's interaction with the oil industry was less boring than its *official* drilling nomenclature system might suggest.

decomposition, have for weeks and now months been washing up in marshes and on beaches, on top of the water and all through it in underwater plumes, often mixed with now banned poison "dispersants." People and businesses all along the Gulf are going broke and are depressed and hurt. Nobody seems to be able to stop it or even much slow it down. It is still happening and nearly certainly will continue to happen. Hence this suit.

**II.**     <u>**The Test for the Motions to Dismiss**</u>.

    **A.**     <u>**We Meet The Test for Motions to Dismiss for Failure to State a Claim.**</u>

There is a buzz among the defense bar that the old grizzled veteran <u>Conley</u>[5] rule has been tightened up some, based on the Supreme Court's opinions in <u>Twombly</u>[6] and <u>Iqbal</u>.[7] But Fed. R. Cuv. Proc. 8(a)(2) is still on the books and it is still enforced according to its terms by the United States Supreme Court and by the Court of Appeals for the Eleventh Circuit.[8] Here is how the Supreme Court phrased the Rule 8(a)(2) test in <u>Iqbal</u>:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in <u>Twombly</u>, 550 U.S. 544, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation . . . . A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S.,

---

[5] <u>Conley v Gibson</u>, 355 U.S. 41 (1959).

[6] <u>Bell Atl. Corp v Twombly</u>, 550 U.S. 544 (2007).

[7] <u>Ashcroft v Iqbal</u>, ___ U.S.___, 129 S.Ct. 1937 (2009).

[8] <u>Harrison v Benchmark Electronics</u>, 593 F.3d 1206, 1214 (11ᵗʰ Cir. 2010) quoted <u>Twombly</u> and Rule 8(a)(2) in reversing [among other things] a Rule 12(b)(6) dismissal, saying that "We only require that a plaintiff provide "a short and plain statement of the claim showing that [he] is entitled to relief."

at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.,* at 557.

>    To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.,* at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, if "stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.,* at 557.[9]

We do meet the <u>Twombly</u>/<u>Iqbal</u> test which not unreasonably requires "more than a sheer possibility that a defendant has acted unlawfully." Everybody in America *except apparently these defendants* knows that in this deal there is "more than a sheer possibility that a defendant has acted unlawfully." And the complaint says so, quite well enough. That's all that's required.

**B.      <u>No More Definite Statement is Required.</u>**

Halliburton has moved for a more definite statement, but it isn't justified. The comments to Rule 12 say that a motion for more definite statement should not to be granted just to clarify the issues or to give the moving party information needed to prepare a defense of the action. A motion for more definite statement is authorized only if the pleading is so vague and ambiguous that the defendant cannot frame a responsive pleading. Clearly, in this case, the complaint qualifies as a short, plain statement of the claim. The information which Halliburton seeks by its motion for more definite statement should be gotten during discovery, not from the initial pleadings. They know what we claim.

---

[9] <u>Iqbal</u>, slip sheet at 13-14.

As discussed above, Rule 8 provides that a complaint need only be a short and plain statement of the claim showing that the pleader is entitled to relief.  So motions for more definite statement are disfavored and seldom granted.[10]  Motions for more definite statement are not a substitute for discovery, and should not be granted where the information sought could better be obtained through discovery.[11]  As a disfavored remedy, motions for more definite statement should only be granted when the pleading is "unintelligible, or so hopelessly vague and ambiguous that a defendant cannot fairly be expected to frame a response or denial, at least not without risking prejudice."[12]  Plaintiff's complaint here clearly meets the test of Rule 8, and Halliburton's motion is due to be denied.

### C.   The Test For Rule 12(b)(1) Is Irrelevant Here.

Rule 12(b)(1) allows motions to dismiss for lack of subject matter jurisdiction.  About twenty years ago the Eleventh Circuit started clarifying Rule 12(b)(1) by distinguishing between "Rule 12(b)(1) *facial* attacks" and "Rule 12(b)(1) *factual* attacks," and that area of law has evolved.[13]  But it isn't necessary to get into all that here.  We have not yet sued in this case under OPA 90, so whether or not we have previously "presented" an OPA claim is irrelevant and so is the subject matter jurisdiction attack in the motions, and so is Rule 12(b)(1).

---

[10] Fathom Exploration, LLC v. Unidentified Shipwreck Vessel, 352 F. Supp. 2d 1218, 1222 (S.D. Ala. 2005)(Judge Steele).

[11] *Id.* at 1221-22.

[12] *Id.*

[13] *E.g.*, In re CP Ships Ltd. Securities Lit., 578 F.3d 1306, 1311-13 (11th Cir. 2009).

**III.** **This Court Does Not Lack Subject Matter Jurisdiction in This Case for Want of Presentment of a Claim Under OPA 90.**

Defendants have made these motions a whole lot more complicated than they need to be, by saying that this Court lacks jurisdiction over this case because plaintiffs' failure to "present" a claim to a "responsible party"[14] under OPA is jurisdictional, and so this whole case has to be thrown out, they say.

The most basic problem with their whole argument is that **plaintiffs have not yet in this case even sued under OPA**. So all of that talk about lack of jurisdiction is just not even necessary to figure out. But we are *very sure* that there is not a jurisdictional issue here *now*, for the simple reason that this lawsuit does not yet have an OPA claim.

Furthermore, if and to the extent that defendants are saying that **even for non-OPA claims** we are required to make "presentment" to one or more "responsible parties" before suing, they are just wrong; OPA does not require that a plaintiff has to present an OPA claim before filing a *non-OPA* case.[15]

**IV.** **The Oil Pollution Act of 1990 Does Not Preempt or "Displace" Plaintiffs' State Law Claims.**

Defendants say that the Oil Pollution Act of 1990 preempts or "displaces" plaintiffs' state law claims. They're wrong about that, too.

---

[14] On April 28, 2010 the Coast Guard declared that BP and Transocean were "responsible parties" under OPA.

[15] Russo v M/T DUBAI STAR, ___ F. Supp. 2d___ (N.D. Cal. April 29, 2010) (Civ. No.09-05158) (Judge Susan Illston).

**The statute itself** specifically SAYS that it doesn't preempt or displace state law remedies. The statute itself?  Justice Frankfurter liked the "canon of construction of the wag who said, when the legislative history is doubtful, go to the statute."[16]  Same deal here.

Here's where the statute **specifically says** that it does not preempt state law claims:

33 U.S.C.§2718.  Relationship to Other Law.

(a)      Preservation of State Authorities . . . Nothing in this Act. . . shall --

(1)      affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to --

(A)      the discharge of oil or other pollution by oil within such State; or

(B)      any removal activities in connection with such a discharge; or

(2)      affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under . . . State law, including common law.

* * * *

(c)      Additional requirements and liabilities; penalties -- Nothing in this Act . . . shall in any way affect, or be construed to affect, the authority of . . . any State or political subdivision thereof --

(1)      to impose additional liability or additional requirements . . .

---

[16] <u>Greenwood vs United States</u>, 350 U.S. 366, 374 (1956).

-7-

The Supreme Court of the United States shares our view of the OPA preemption statute. In its unanimous opinion dealing with OPA preemption of state law in 2000, United States v Locke,[17] the Court distinguished between state statutes regulating the details of vessel navigation and the like -- which **are** preempted by OPA[18] -- and state laws imposing ordinary tort liability on oil spillers -- which **are not** preempted by OPA. Here's how Justice Kennedy put it for the unanimous Court:

> The saving clauses are found in Title I of OPA, captioned Oil Pollution Liability and Compensation and creating a liability scheme for oil pollution . . . . Title I does not regulate vessel operation, design, or manning. Placement of the saving clauses in Title I of OPA suggests that Congress intended to preserve state laws of a scope similar to the maters contained in Title of I of OPA, not all state laws similar to the matters covered by the whole of OPA or to the whole subject of maritime oil transport. **The evident purpose of the saving clauses is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules . . . relating to oil spills . . . .**
>
> Our conclusion is fortified by Congress' decision to limit the saving clauses by the same key words it used in declaring the scope of Title I of OPA. Title I of OPA permits recovery of damages involving vessels "from which oil is discharged, or which pose[e] the substantial threat of a discharge of oil'" 33 U.S.C.§2702(a). **The saving clauses, in a parallel manner, permit States to impose liability . . . "relating to the discharge, or substantial threat of a discharge, of matter oil." § 2718(c).**[19]

The District Court for the District of Maryland, dealing with state common law claims for oil pollution and a defense claim of preemption by OPA, specifically held that the Supreme Court's

---

[17] 529 U.S. 89 (2000).

[18] A classic post-Locke example of the preemption by OPA of this kind of detailed state statutory navigational requirement is United States v Massachusetts, 440 F. Supp. 2d 24 (D. Mass. 2006), in which the United States sued Massachusetts to have struck down detailed navigational requirements contrary to the Federal requirements.

[19] *Id.* at 105 [emphasis added].

<u>Locke</u> decision held and required that state tort causes of action are not preempted by OPA, writing that:

> For all of PEPCO's arguments that OPA preempts state common law causes of action to recover removal costs and damages in oil spill cases because the state actions would conflict with OPA's "full purposes and objectives," [cites omitted], the matter was effectively put to rest in <u>U.S. v Locke</u>, 529 U.S. 89 (2000), decided by the Supreme Court last term. [extensive quotes from <u>Locke</u> deleted]. The Supreme Court has thus effectively foreclosed any argument as to preemption in this case. OPA does not preempt "state laws of a scope similar to the matters contained in Tittle I of OPA," such as the state common law actions pleaded here.[20]

And, even if state law gives plaintiffs a better deal than OPA does, the OPA preemption provision was passed to allow just that, according to Judge Rebecca Beach Smith of the District Court for the Eastern District of Virginia:

> The savings clause [in OPA] was added to allow the states to enact legislation protecting their citizens and their resources to a greater extent than the protection offered by OPA. It was meant to allow the states to go beyond the basic protection of the federal law. The beneficiaries of the savings clause, therefore, are the victims of oil spills.[21]

To our surprise, despite the wording of the statute and the ringing language of the Supreme Court in <u>Locke</u>, there are a few lower court cases that have misread both the statute and the Supreme Court's opinion in <u>Locke</u> and have thought that OPA preempts state remedies. Well, bless their hearts; like these defendants, they're just wrong about that.

---

[20]   <u>Williams v Potomac Electric Power Co.</u>, 115 F. Supp. 2d 561, 564 (D. Md. 2000).

[21]   <u>National Shipping Co. v Moran-Mid-Atlantic</u>, 924 F. Supp. 1436, 1449 (E.D. Va. 1996).

V.      **OPA Does Not Preempt or "Displace" Tort Remedies Under the General Maritime Law.**

Defendants argue that OPA preempts or "displaces" traditional tort remedies under the general maritime law.  But once again OPA has a specific statutory provision which expressly preserves them:

> 33 U.S.C. §2751. Savings Provision.
>                           *   *   *   *
>
> (e)     Admiralty and Maritime law -- Except as otherwise provided in this Act, this Act does not affect --
>
> (1)     admiralty and maritime law; or
>
> (2)     the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

That's what the statute says, and the statute makes clear that unless there is a specific provision which changes the rule which admiralty would provide -- such as for example specifically eliminating the Limitation Act's application in OPA cases -- admiralty law remains applicable.

That's what the statute says.  Even bearing in mind Justice Frankfurter's "canon of construction of the wag who said, when the legislative history is doubtful, go to the statute,"[22] we *have* first gone to the statute, so it is OK to look now at the legislative history, which makes clear that tort claims under the general maritime law are not preempted by OPA.  The legislative history of the admiralty saving clause in OPA was extensively analyzed in 2001 in <u>Tanquis v M/V</u>

---

[22]   <u>Greenwood vs United States</u>, 350 U.S. 366, 374 (1956).

WESTCHESTER,[23] by Judge Edith Brown Clement, then of the Eastern District of Louisiana (and

since late 2001, of the United States Court of Appeals for the Fifth Circuit):

> The Conference report indicates that, at the time the proposed
> legislation reached the Conference, it contained some non-preemption
> provisions but lacked others. Accordingly, the Conference added the
> admiralty and maritime law savings clause . . . to make clear that
> "there is no change in current law unless there is a specific provision
> to the contrary." H.R.CONF.REP. 101-653, reprinted in 1990
> U.S.C.C.A.N. 779. Consistent with this principle, OPA does not
> "change the jurisdiction in incidents that are within the admiralty and
> maritime laws of the United States."

Judge Brown's opinion reprinted "the entire discussion of the admiralty and maritime savings

clause" from the Conference Report, included in which was this:

> SEC 6001. SAVINGS CLAUSE

> The Senate amendment has no savings provision regarding admiralty
> and maritime laws or jurisdiction.

> Section 6001 of the House bill clarifies that the House bill does not
> affect admiralty and maritime law or the jurisdiction of the District
> court of the United States with respect to civil actions under admiralty
> and maritime jurisdiction, saving to suitors in all cases other remedies
> to which they are entitled. Article III, clause 2, of the Constitution
> creates the basis for admiralty and maritime law of the United States.

> This section is intended to clarify that the House bill does not
> supersede that law . . .

> The Conference substitute adopts the House provision with respect to
> admiralty and maritime laws . . . . Therefore, there is no change in
> current law unless there is a specific provision to the contrary.

---

[23] 153 F. Supp. 2d 859 (E.D. La. 2001).

> It is not the intent of the Conferees to change the jurisdiction in incidents that are within the admiralty and maritime laws of the United States.[24]

As nearly as we have found, only one United States Court of Appeals has addressed the meaning of the admiralty saving clause, the First Circuit's 1997 decision in In re: METLIFE Capital Corp.[25] In METLIFE the First Circuit held that Limitation Act cases could not bar OPA claims, but further held that in light of OPA's admiralty saving clause, claims under the general maritime law were not preempted and could still be brought into the limitation concursus:

> Some claims arising from an incident in which oil pollution occurs do not escape the Limitation Act. For example, that Act remains in force for general maritime claims such as maritime tort actions for harms to persons or vessels. See 33 U.S.C. Sections(s) 2751(e) ("[e]xcept as otherwise provided in this chapter, this chapter does not affect . . . . admiralty and maritime law"). The district court below, in keeping with the OPA's savings provision in Section(s) 2751(e), reserved the Limitation Plaintiffs' right "to seek limitation of liability for those claims subject to reduction under the Limitation Act." Therefore, the Bunker Group's contention that the district court's order exempts from Rule F concursus all claims arising from the grounding, whether or not they arise under the OPA, is without merit. The appellants remain free to avail themselves of the Limitation Act and Rule F concursus for their non-OPA claims.[26]

Or, in other words, OPA does not preempt tort claims under the general maritime law in oil spill cases. That's the way the District Court read it on remand, too, in an unreported opinion saying that the admiralty saving clause preserves claims under the general maritime law.[27]

---

[24]  Id. at 868.

[25]  132 F.3d 818 (1st Cir. 1997).

[26]  Id. at 822-23.

[27]  Commonwealth of Puerto Rico v M/V EMILY S., 1998 WL 938585, 1998 A.M.C.2726 (D. Puerto Rico July 28, 1998) (No. 94-1019CCC).

We fully understand that there are some District Court cases which say that OPA preempts actions under the general maritime law. But unlike Judge Clement and the First Circuit, they must not have accurately read the admiralty saving clause of OPA and its legislative history.

## VI.   <u>OPA Does Not Preempt or "Displace" the Outer Continental Shelf Lands Act.</u>

Defendants evidently think that OPA displaces all other statutes and bodies of law of all kinds, state or federal, statutory or judge-made. At least, if they have any reservation at all about that, it is not self-evident. That also seems to be BP's position in particular with respect to the Outer Continental Shelf Lands Act,[28] too [let's just call it by its nickname "OCSLA" since that's a lot shorter]. BP does not exactly say that OPA preempts OCSLA, but only keeps saying things like that OCSLA might apply "if OPA did not exist."[29]

The problem with this approach is that nobody seems to have cited any statute or any case which says that OPA preempts or "displaces" OCSLA. We don't think OPA does preempt or "displace" OCSLA, especially since nobody seems to have cited any statute or any court decision which says so. In the complete absence of any case or any statute which says so, that would be a very long step for a District Court to take on a motion to dismiss. Too long, we think.

## VII.   <u>Choice of Law.</u>

For these tort claims, there is a very basic issue as to choice of law, whether they are governed by admiralty law or by state law -- and if by state law, which state? -- and before we can get into the issue of whether each count states a claim upon which relief can be granted "under applicable law," why then, we have to decide just what is the body of "applicable law." Basic stuff.

---

[28]  43 U.S.C. § 1331 *et seq.*

[29]  BP's brief page 9 line 1 and note3; page 14 line 1 in second paragraph.

It turns out that it's too early in this case, and on this record, to decide which body of law is *applicable*.

### A.      Choice of Law If State Law Applies Under its Own Power.

We all know how the normal choice of law rules would apply here to state law claims outside the realm of admiralty and federal statute, namely, (1) we have only alleged that this is a **diversity** case [we did not allege admiralty *jurisdiction* or federal question *jurisdiction* or Outer Continental Shelf Lands Act *jurisdiction* although those bodies of law may well apply] so NORMALLY the issue of whose body of law applies would be decided by Erie,[30] (2) under Erie, the body of choice-of-law rules to be applied would be the state choice-of-law rules in the forum state,[31] (3) in tort cases Alabama has for more than a century applied the rule of "the law of the place of the wrong" or *lex loci delicti*[32], (4) and the place of the tort is where the injury occurred.[33]   Under that analysis, Alabama law would govern the state law claims of Alabama plaintiffs, since the oil which damaged Alabama plaintiffs came ashore here in Alabama. So Alabama substantive law would apply, *unless* Federal law requires a different result, such as that either admiralty law or The Outer Continental Shelf Lands Act requires otherwise.  And as we see, if they do apply they might require a different result, but on this record so far that choice of law issue simply cannot be decided yet.

---

[30]  Erie RR Co. vs Thompkins, 304 U.S. 64 (1938).

[31]  Klaxon v Stentor Elec. Mfg. Co., 313 U.S. 487 (1941).

[32]  Lifestart Response v Admiral Ins., 17 So. 3d 200, 213 (Ala. 2009).

[33]  Fitts v Min. Mining & Mfg., 581 So. 2d 819, 820 (Ala. 1991); Alabama Great Southern RR v Carroll, 97 Ala. 126, 11 So. 803 (1892).

**B.**   **Choice of Law: Is There Admiralty Jurisdiction Over These Tort Claims?**

Leaving aside for now the merits issues such as <u>Robins Dry Dock</u> issues, which we will shortly discuss, the second choice of law question is whether there is or is not admiralty jurisdiction over these non-death, non-injury tort claims brought by people who were not injured or killed on a vessel. If there is admiralty jurisdiction, then it normally ousts state law from its own application,[34] except for certain circumstances when as a matter of grace admiralty law applies state law as surrogate admiralty law in "twilight zone" areas or to supplement available remedies in certain narrow instances.

A relatively recent[35] line of U.S. Supreme Court admiralty cases -- namely <u>Grubert</u>,[36] <u>Sisson</u>,[37] <u>Foremost</u>[38] and <u>Executive Jet</u>[39] -- has made clear that for the admiralty jurisdiction of the United States to apply to the claims in a lawsuit, the accident or event or transaction involved must have both (1) a maritime location or "*locality*," and (2) a maritime connection or "*nexus*."

---

[34] "With admiralty jurisdiction comes the application of substantive admiralty law. See *Executive Jet Aviation*, 409 U.S., at 255. Absent a relevant statute, the general maritime law, as developed by the judiciary, applies." <u>East River S.S. Co. v Transamerica Delaval</u>, 476 U.S. 858, 864 (1986).

[35] Heck, in admiralty ***anything*** that's only forty years old is "relatively recent;" we are ***still*** arguing over what Justice Story meant in <u>The Amiable Nancy</u>, 3 Wheat. 546 (1818), *see* <u>Atlantic Sounding Co. v Townsend</u>, ___ U.S. ___, slip op. at 5 (U.S. June 25, 2009), and don't ***dare*** get us all started on the application *outside* admiralty of Chief Justice Marshall's opinion in <u>The Charming Betsy</u>, 2 Cranch. 64 (1804), see <u>Skilling v United States</u>, ___ U.S.___ slip op. at 41, n.41 (U.S. June 24, 2010). In admiralty, like Faulkner said of the South, "the past is not even past."

[36] <u>Jerome B. Grubert, Inc. v Great Lakes Dredge and Dock</u>, 513 U.S. 527, 534 (1995).

[37] <u>Sisson v Ruby</u>, 497 U.S. 358, 363-64 (1990).

[38] <u>Foremost Ins. Co. v Richardson</u>, 457 U.S. 668 (1982).

[39] <u>Executive Jet Aviation v City of Cleveland</u>, 409 U.S. 249 (1972).

There was clearly a maritime *locality* for this accident, since the DEEPWATER HORIZON at the time of the accident was floating or even "navigating" -- if staying precisely still under engine power is "navigating" -- upon navigable waters, namely, the high seas, clearly a maritime "locality." So locality is not an issue here.

But for the admiralty jurisdiction to apply, a maritime *locality* is not enough, and there must also be a maritime *"nexus"* or connection to maritime matters or affairs.[40]  The Supreme Court's Sisson[41] opinion in 1990 set out the two-part *nexus* test which is currently used, and the Supreme Court's 1995 Great Lakes Dredge[42] opinion summarized the Sisson two-part *nexus* test this way:

> The connection test raises two issues.  A court, first, must "assess the general features of the type of incident involved," 497 U.S., at 363, to determine whether the incident has "a potentially disruptive impact on maritime commerce," id., at 364, n.2.  Second, a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity."  Id. at 365, 364, and n.2.[43]

For purposes of admiralty *nexus* it seems pretty clear that the DEEPWATER HORIZON was a "vessel."  There are plenty of cases in the Fifth and the Eleventh Circuits holding such rigs to be "vessels," and the U.S. Supreme Court in Stewart v Dutra, 543 U.S. 481 (2005) standardized the meaning of the word "vessel" and used the definition from 1 U.S.C. § 3 [pretty basic law there] as "includes every description of water-craft or other artificial contrivance used, or capable of being

---

[40] This is the point of the Supreme Court opinions in Grubert, Sisson, Foremost and Executive Jet.

[41] Sisson v Ruby, 497 U.S. 358, 363-64 (1990).

[42] Jerome B. Grubert, Inc. v Great Lakes Dredge and Dock, 513 U.S. 527, 534 (1995).

[43] 513 U.S. at 534.

-16-

used, as a means of transportation on water." That seems clearly to cover the DEEPWATER HORIZON. We doubt that anybody will claim otherwise. We sure don't.

But just because there was a "vessel" floating up above this well at the time of the explosion does not answer the question whether there is or is not a maritime *nexus* for these cases, as compared to the death and injury cases filed by or in behalf of the people who were on the vessel. Did *the vessel* cause our tragedy -- that is, either the vessel itself or the people running it -- or is this *a seabed case*, that is, did the hole in the seabed and the things going into and out of it cause this tragedy? Or both? It isn't easy to say, and on the record at this stage, it's impossible to say.

One clearly complicating issue is Sohyde Drill & Marine v Coastal States Gas, 644 F.2d 1132 (5th Cir. 1981), with legendary admiralty Judge John R. Brown writing for the Court of Appeals for the Fifth Circuit. Whatever Sohyde held as a matter of law, it is binding precedent in both the new Fifth and the Eleventh Circuits[44] until it is overruled en banc by one or both of those two Courts. But the question seems to be, just exactly what did Sohyde hold as a matter of law, which all courts in both circuits are required to follow? That has not been an easy question even for other appellate judges in those circuits to answer. **It's especially interesting for us here, because Sohyde is an oil spill case involving the failure of a blowout preventer to properly operate.** Sohyde was as a matter of interest the first of several Fifth Circuit [old and new Fifth] cases dealing with whether or not blowout preventer cases do or don't have a maritime *nexus*. The line of cases is less than fully satisfying on that point.

---

[44] Sohyde was decide on May 14, 1981. As this Court is well aware, In Bonner v City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the first Eleventh Circuit case, the Eleventh circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, following which the Circuit split took effect, which authority stands unless and until overruled.

The holding of Sohyde, to be precise, is that even assuming that the semi-submersible involved there was a "vessel,"[45] the failure *in that case* of a blow-out preventer did not involve a maritime *nexus*. Sohyde was a maritime tort case and it has never been overruled. Relying on Sohyde, a law review article in the Tulane Law Review on the liability connected with offshore drilling says flatly that "tort suits based on blowouts are generally non-maritime."[46]

Well, maybe so, but maybe not. That rather expansive view of Sohyde is not the whole story. For one thing, in Sohyde the drilling rig was all the way at the end of a shallow canal, and sitting on the bottom on mud, which certainly seemed to affect Judge Brown's *nexus* analysis.[47] Here, the rig was out on the Gulf of Mexico on very deep water, and apparently -- the facts are not yet before the Court -- had its engines running and being used as propulsion to keep the rig precisely in place over the well, which is a lot more maritime than Sohyde.

And for another thing, Sohyde focuses only on the blowout preventer down on the bottom, and not on the possible role of the vessel and its appurtenances -- vessel's appurtenances *other than* a blowout preventer, maybe some will argue[48] -- and its crew. By comparison Judge Edith Jones in

---

[45] Since Judge Brown's opinion in Sohyde the U.S. Supreme Court in Stewart v Dutra, 543 U.S. 481 (2005) standardized the meaning of the word "vessel" and used the definition from 1 U.S.C. § 3. For purposes of this motion we simply assume that it was a "vessel."

[46] D. Shilliday, W. Mayer, J. Michael, and A. Slania, Contractual Risk-Shifting in Offshore Energy Operations, 81 TULANE L. REV. 1579, 1591 (2007) (citing Sohyde).

[47] Judge Brown later seemed defensive about Sohyde, for example in Domingue v Ocean Drilling and Exploration Co., 923 F.2d 393 (5th Cir. 1991), writing a long footnote explaining it, id. at 397 n.9.

[48] It is not clear as a matter of law on this record whether the BOP had become a part of the seabed like a pipe casing, or an appurtenance of the vessel or what. This may be a test case in the law of fixtures on the seabed.

the 2005 Fifth Circuit case <u>Hoda v Rowan Companies, Inc.</u>,[49] a contract case arising out of a tort case, also dealt with a blowout preventer's maritime *nexus* or not. Billy Hoda was working on a jack-up rig on the Outer Continental Shelf, torquing down some nuts on a blowout preventer, when he tripped on some hoses and got hurt. By the time the case got to the Fifth Circuit, though, it was an indemnity contract suit among businesses for the damages. So it was a contract suit arising out of a tort suit, if that matters. And, it might well matter, since although a maritime *nexus* is required for both admiralty tort and admiralty contract cases -- and it is not fully clear whether there is or is not a different test for maritime *nexus* between tort and contract cases -- the "*nexus*" part talks about what is that with which the suit is connected. For instance a tort suit by a crew member might be intimately connected to the vessel, but the contract indemnity suit might be more remote from the vessel. Indeed, several Fifth Circuit cases trying to distance themselves from <u>Sohyde</u> -- including Judge Brown himself in <u>Domingue</u>[50] -- have emphasized the difference for *nexus* purposes between contract suits and tort suits, with little explanation of why that should be.[51] In any event in <u>Hoda</u> Judge Jones wrote that:

> The work order called for Greene's to torque up and torque down the blow-out preventer stacks, and Greene's crew performed their services aboard a vessel in navigable waters, in coordination with and

---

[49]  419 F.3d 379 (5th Cir. 2005).

[50]  <u>Domingue v Ocean Drilling and Exploration Co.</u>, 923 F.2d 393, 397 n.9 (5th Cir. 1991).

[51]  <u>Hoda v Rowan Companies</u>, 419 F.3d 379, 382 n. 6 (5th Cir. 2005) (noting <u>Domingue</u> case, below, discounting strength of <u>Sohyde</u>, a property damage case, in cases involving "maritime/non-maritime" contract interpretation); <u>Domingue v Ocean Drilling and Expl. Co.</u>, 922 F.2d 393, 397 n. 9 (5th Cir. 1991) (saying that under traditional analysis <u>Sohyde</u> was clearly an admiralty case, but the only new wrinkle was the requirement of Maritime *nexus* which <u>Executive Jet</u> added to the requirement of admiralty jurisdiction in tort cases as well as contract cases); <u>Thurmond v Delta Well Surveyors</u>, 836 F.2d 952 n.1 (5th Cir. 1988).

deference to the rig's personnel. Hoda was injured while performing the specified work. The only one of the <u>Davis [& Sons v Gulf Oil Corp.</u>, 919 F.2d 313 (5th Cir. 1990) (admiralty choice of law)] factors plausibly in doubt is Factor no. 4, the question whether Greene's work was "related to the mission of the vessel." We conclude, paraphrasing <u>Demette</u> [v Falcon Drilling Co., 280 F.3d 492 (5th Cir. 2002)] that torquing up and torquing down blow-out preventers "is an integral part of drilling, which is the primary purpose of the vessel." 280 F.3d at 5021. This conclusion is not merely descriptive, but derives from the functional interrelationship of Greene's work with the rig.[52]

Similarly, the Fifth Circuit in <u>Broughton Offshore Drilling v South Central Machine</u>[53] dealt with a blowout preventer that damaged a vessel. Suit was in tort. The Court of Appeals distinguished <u>Sohyde</u> and held that there was a maritime *nexus*:

We find marked differences, however, between <u>Sohyde</u> and the instant case . . . The damages in this case are intensely maritime in nature and could not easily have occurred in land-based operation. The injury was not merely to a wellhead and an oil and gas reservoir, but to the vessel itself. Recovery of the blowout preventer from the Gulf required an underwater salvage operation. The rig could not be safely towed to port . . . . Full repairs could not be completed until the barge was placed in dry dock. In short, the damage in <u>Sohyde</u> was to the reservoir of an oil well and the well head. Here, the damage was to a vessel.

Similarly, the situs of the accident in this case more clearly implicated federal maritime interests than did the <u>Sohyde</u> accident. While the <u>Sohyde</u> incident occurred at the end of a small, single purpose, dead-end canal, this accident occurred in the Gulf of Mexico, a body of water teeming with maritime activity.

\*    \*    \*    \*

---

[52] *Id.* at 383.

[53] 911 F.2d 1050 (5th Cir. 1990).

> Unless and until <u>Sohyde</u> is overruled by an en banc court, we are
> bound by it.  But we will not extend the case beyond its factual
> setting.[54]

So, while <u>Sohyde</u> suggests that there is *not* a maritime *nexus* to a tort claim resulting from a blow-out

preventer, still, if someone *on a vessel* is working with or using a blowout preventer, or if a BOP

damages a vessel, <u>Hoda</u> and <u>Broughton</u> and other cases suggest there might well be a maritime

*nexus*.  And that's just the blowout preventer, before we get to cementing, and mud, and casings and

equipment for the drill shaft,[55] and management decisions, and chewed-up rubber seals, or any of that

stuff that involves the seabed and the subsoil.  If the type of well casing used is wrong, is that

connected to the vessel for *nexus* purposes?  What if the mud pressure is not kept up in the casing?

What if not enough spacers are used around the casing?  Do those issues have a maritime *nexus*?

What if the torts were caused by the vessel and the subsoil and seabed combined, combined and

concurring negligence, what does that do to the *nexus* requirement?

Those are not easy questions.  Sooner or later, on some record, they have to be decided.  But

not on the record of a Rule 12(b)(6) motion to dismiss made against the allegations on the face of

the complaint.  It is not on this record possible to say whether there is or is not a maritime *nexus*.

That clearly means that on this record so far, it is not possible to say whether admiralty does or does

not apply.

---

[54] *Id.* at 1052-53.

[55] *E.g.*, <u>Houston Oil & Minerals v American International Tool</u>, 827 F.2d 1049 (5th Cir. 1987) ("mud saver sub" which goes between "the kelly" [the portion of the pipe which goes through the rotary table] and the drill stem; Fifth Circuit grudgingly follows <u>Sohyde</u> and applies land law).  *See also* <u>Thurmond v Delta Well Surveyors</u>, 836 F.2d 952 (5th Cir. 1988) (Judge Wisdom) (wireline services are non-maritime).

## C.   Choice of Law Under OCSLA.

A part of the Outer Continental Shelf Lands Act allows for the borrowing for use there of the

law of an "adjacent state" as surrogate federal law in certain cases, if admiralty law does not apply

in them.   On that issue OCSLA at 43 U.S.C.§1333(a)(2)(A) says:

> To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, **the civil and criminal laws of each adjacent State,** now in effect or hereafter adopted, amended, or repealed **are declared to be the law of the United States of that portion of the subsoil and seabed of the outer Continental Shelf,** and artificial islands and fixed structures erected thereon, **which would be within the area of the state if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in the Federal Register such projected lines extending seaward and redefining each such area.**   All of such applicable laws shall be administered and enforced by the appropriate officers and court of the United States.   State taxation laws shall not apply to the outer Continental Shelf.

[Emphasis added].

So, just how are we supposed to approach choice of law under OCSLA?   In <u>Grand Isle</u>

<u>Shipyard v Seacor Marine</u>, 589 F.3d 778 (5th Cir. 2009) (en banc), the Fifth Circuit said:

> To determine whether OCSLA required application of state law to this dispute, the district court applied the three-part test that the Supreme Court formulated in *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352 (1969).   We have applied that test in a number of cases, including *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990) (hereinafter *PLT*).   As we articulated the *Rodrigue* test in *PLT*, for state law to apply as surrogate federal law, three conditions must be met: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil and seabed, or artificial structures permanently or temporarily attached thereto).   (2) Federal maritime law must not apply of its own

force. (3) The state law must not be inconsistent with Federal law."
*Id.*[56]

### 1.   Admiralty Law vs "Subsoil and Seabed" State Law.

Relevant facts must ultimately intrude, and we are at this point -- a motion to dismiss -- not dealing with facts. But the OCSLA choice-of-law process is heavily fact-dependent. The statute and the Courts ask: Does this controversy "arise on" the "subsoil and seabed?" If it "arises on" "the subsoil and seabed," then under OCSLA adopted state law might apply. Surrogate state law "might apply" that is, unless admiralty law applies of its own force and unless state law is inconsistent with Federal law, whatever that means; if it "arises on" a vessel, rather than on the "subsoil and seabed" then admiralty law might well apply.

### 2.   If Admiralty Law Does Not Apply of Its Own Force, Then What State Law Is Adopted As Surrogate Federal Law Under OCSLA?

OCSLA says in 43 U.S.C. §1333(a)(2)(A) that if OCSLA applies, and that if admiralty law doesn't, then the Court must apply the law of the "adjacent state," the one "which would be within the area of the state if its boundaries were extended seaward to the outer margin of the outer Continental Shelf." The statute requires the President to "determine and publish in the Federal Register such projected lines extending seaward and redefining each such area."

But, the Fifth Circuit said in 2000 in Snyder Oil Corp.[57] that the President had *not* drawn those projected lines under that statute,[58] and we don't think he has done it since then. And it seems clear that not just any agency document would suffice, either; it would take a very special and precise

---

[56] *Id.* at 782-83.

[57] 208 F.3d 521, 524 (5th Cir. 2000).

[58] Snyder Oil Corp. v Samedan Oil Corp., 208 F.3d 521, 524 (5th Cir. 2000).

determination pegged to 43 U.S.C. § 1333(a)(2)(A) to fit the bill, although other matters may also be relevant evidence.[59] Furthermore we are told that the MMS [or whatever its name is today or may be tomorrow] has so far refused to make *ad hoc* adjacency determinations.[60]

So in default of Presidential action the Fifth Circuit has conducted its own adjacency analysis under OCSLA. In 1990 in Reeves v B&S Welding, Inc.,[61] the Court considered four factors, which it summarized in 2000 in Snyder Oil Corp. v Samedan Oil Corp. like this:

> While [in Reeves] we did not articulate a specific test, we therefore considered four types of evidence in the "adjacency" analysis: (1) geographic proximity; (2) which coast federal agencies consider the subject platform to be "off of;" (3) prior court determinations; and (4) projected boundaries.[62]

In Snyder the lawsuit involved an offshore drilling dispute, and it was filed in the Western District of Louisiana, but **the District Court in the Western District of Louisiana held that under OCSLA the "adjacent" state was Alabama and so Alabama law applied**, and therefore it transferred the case under 28 U.S.C. § 1404(a) to the Southern District of Alabama. Plaintiff appealed. Applying the Reeves factors, the Court of Appeals for the Fifth Circuit in Snyder Oil *held that Alabama law applied to that offshore drilling case, even though the platform was six miles closer to Louisiana than to Alabama*,[63] in part because of evidence:

---

[59] *Id.*

[60] *Id.*

[61] 897 F.2d 178 (5th Cir. 1990).

[62] *Id.* at 524.

[63] *Id.* at note 2.

> that if the Mississippi-Alabama border is extended seaward from the
> three mile line through the OCS, either due South or in the natural
> southeasterly direction of the common boundary (the two projections
> favorably considered in *Reeves*) block 2612 lies eastward of the
> extension and hence is in Alabama waters.

*Id.* at 526.  On that basis the Court also upheld the Section 1404(a) transfer to Alabama.

When BP filed its initial drilling documents it said that the well would be located at Latitude 28 °44' 17.277 N, and Longitude 88 °21' 57.340 W.  Where's that?  To what state is it "adjacent" within the meaning of 43 U.S.C. § 1333(a)(2)(A)?

Everybody knows that the Court can take judicial notice of a map,[64] and internet-based services such as Google Maps are just modern electric maps.[65]  Well, using most any of those services,[66] if you draw a line **straight south** from the end of the Alabama-Mississippi line, at the southwesternmost point of Alabama -- like the Fifth Circuit approved in Snyder[67] -- *that well is on the Alabama side of the line.*

Or, if you extend the moderately slanted Alabama-Mississippi line out into the Gulf, which slants toward the Southeast for historical reasons, *then this rig was also East of that line, on the*

---

[64]  *E.g.*, United States v Coutchavlis, 260 F.3d 1149, 1153-54 (9th Cir. 2001).

[65]  BP itself, in asking the Court to take judicial notice of the BP claims process, cites Marsh v Butler County, 268 F.3d 1014, 1049 n.3 (11th Cir. 2001) for its "taking judicial notice of the location of a city, highway, and business after referencing their locations on the Mapquest internet site," BP brief at note 1.

[66]  Maybe one of the better ones is the NOAA web site, which shows the Alabama-Mississippi state line on out past the barrier islands, shows the location of the well, and allows the cursor's movement to be marked by LAT/LON coordinates:
http://gomex.erma.noaa.gov/erma.html#x=-93.63510&y=28.10954&z=9&layers=497

[67]  *Id.* at 526.

*Alabama side,* although it is close, about 1.757 kilometers -- almost two klicks -- east. That's also what the Fifth Circuit approved in Snyder.[68]

The fact that the well is East of the Alabama Mississippi line suggests that the well was "adjacent to" Alabama within the meaning of 43 U.S.C. § 1333(a)(2)(A).[69] And so under OCSLA, **Alabama** law rather than Louisiana law would apply, if admiralty law does not.

But we don't think the Court should *yet* be making determinations of "adjacency" under OCSLA. It is just too early in the litigation, and there are not facts in the record sufficient properly to support any determination one way or the other.

**VIII.   The Rule in Robins Dry Dock Does Not Bar the Claims in This Case.**

Defendants say that the Rule in Robins Dry Dock bars the claims in this case, but it doesn't.

**A.       Robins Dry Dock and THE TESTBANK Do Not Bar These Claims if They are Admiralty Claims.**

The rule in Robins Dry Dock[70] is ordinarily thought to be that no duty is owed under the law of negligence to a plaintiff that suffers only economic loss as a result of the alleged wrongful act and no personal injury or property damage. The new Fifth Circuit applied Robins Dry Dock in Louisiana ex rel Guste v M/V TESTBANK, 752 F.2d 1019 (5th Cir. 1985) (en banc) in a vessel chemical spill case to kill off pretty well all of the claims in that case. Defendants here rely heavily upon The TESTBANK.

---

[68] *Id.*

[69] Snyder Oil Corp. v Samedan Oil Corp., 208 F.3d 521, 524 (5th Cir. 2000); Pittincrieff Res. v Firstland Offshore, 942 F.Supp. 271 (E.D. La. 1996).

[70] Robins Dry Dock & Repair Co. v Flint, 275 U.S. 303 (1927).

But the Rule in <u>Robins Dry Dock</u> and <u>The TESTBANK</u> do not bar the claims in this case for at least two reasons.

The first and most basic reason that the <u>The TESTBANK</u> and the <u>Robins</u> rule don't bar these claims is that the doctrine has been overruled by statute.  The "Comprehensive Environmental Response, Compensation and Liability Act of 1980" ["CERCLA" (also known as "The Superfund Act"), 42 U.S.C. Section 9601 et seq] was amended just after <u>The TESTBANK</u> in 1986 to overrule <u>The TESTBANK</u> (and <u>Robins Dry Dock</u>), although the issue is so specialized that few have noticed it, or either, maybe some in the past didn't research it as thoroughly as we have.

But good admiralty lawyers have always noticed it.  The foremost admiralty law symposium in America, the Tulane Admiralty Institute, met in 1987, not long after <u>The TESTBANK</u> decision.  The meaning of <u>The TESTBANK</u> was a major issue at that seminar.  Judge Wisdom railed against <u>The TESTBANK</u>, and called <u>Robins Dry Dock</u> "the Tar Baby of tort law."[71]  An admiralty lawyer from Mobile also spoke at that same seminar, and noted a new 1986 amendment to CERCLA which he said "arguably overrules <u>Robins Dry Dock</u> and almost certainly was triggered by -- and overrules <u>State of Louisiana v M/V TESTBANK</u>."[72]  That 1986 statutory provision which overrules <u>The TESTBANK</u> is this immediate post-<u>TESTBANK</u> amendment to CERCLA, 42 U.S.C. § 9607(h) which says:

> **The owner or operator of a vessel shall be liable** in accordance with this section, **under maritime tort law**, and as provided under section 9614 of this title **notwithstanding** any provision of the Act

---

[71] J. Wisdom, <u>Admiralty Jurisdiction and Products Liability: Economic Loss</u>, 62 TULANE L.REV. 325 (1988), quoting himself and citing his own opinion in <u>Louisiana ex rel Guste v M/V TESTBANK</u>, 752 F.2d 1019, 1035 (5th Cir. 1985) (*en banc*) (Wisdom, J., dissenting).

[72] D. Bagwell,   <u>Hazardous and Noxious Substances</u>, 62 TULANE L. REV. 433, 452 (1988).

of March 3, 1851 (46 U.S.C. 183ff) [which is "The Limitation of
Liability Act"] or **the absence of any physical damage to the
proprietary interest of the claimant**.

The legislative history of that provision makes quite clear that it was passed to overrule The
TESTBANK. The original version of CERCLA passed in 1980 had this provision in Section 107(h),
later codified at 42 U.S.C. § 9607(h): "The owner or operator of a vessel shall be liable in
accordance with this section and as provided under section 114 of this Act notwithstanding any
provision of the Act of March 3, 1851 (46 U.S.C.§183ff)."[73] The current version of Section 9607(h)
was part of Amendment 671, introduced on September 23, 1985 by Sen. Lloyd Bentsen of Texas as
a part of the Superfund Amendments and Reauthorization Act of 1986.  It was approved in the
Senate by a voice vote on the same day.  The relevant part of the amendment says: "Section 107(h)
of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 is
amended by inserting 'under maritime tort law," after "with this section" and by inserting before the
period "or the absence of any physical damage to the proprietary interest of the claimant."

Upon introduction of the Amendment, Sen. Bentsen said this:

> [T]his amendment also clarifies the question of accidents involving
> ocean incineration where Federal admiralty and State law are unlikely
> to afford an opportunity for recovery.  There is strong demand,
> interest, and concern that there be clear liability for third-party
> damages as well as the cleanup costs.  So this amendment, as
> prepared, is a change to the Ocean Dumping Act that removes these
> barriers to third-party claims.  **It clarifies the congressional intent
> in that regard, allowing claims for third-party damages under
> other applicable Federal and State law.  Additionally, I have
> clarified that under CERCLA and maritime tort law third
> parties may recover for economic loss due to release of hazardous
> substances even though there is no direct physical damage.** Thus,

---

[73]  Pub.L. 96-510, H.R. 7020, 94 Stat. 2767 (Dec. 11, 1980).

> for example, down in our part of the country commercial fishermen in the gulf [of Mexico] injured by a release from an incineration vessel can recover their damages in that regard.[74]

The House Report issued on October 3, 1986 included this in explanation of the Amendment: "Section 107 of CERCLA is amended to clarify that a vessel owner would be liable in accordance with section 107 under maritime tort law and that physical damage to the proprietary interest of the claimant is not required as a condition of liability."[75]

So what does that mean?  The foremost commentator on the provision says it means that our plaintiffs can sue in this case and not be barred by Robins Dry Dock and The TESTBANK:

> The subsection can be understood to mean that the requirement of physical injury to a proprietary interest and the Limitation of Liability Act are inapplicable in three situations: (1) actions brought under section 9607 of CERCLA, namely the Acts's liability provisions; (2) actions brought under the general maritime law; and (3) actions brought under state law pursuant to the authority of section 9614 of CERCLA.[76]

The second reason that the Rule in Robins Dry Dock does not require dismissal of these claims for failure to state a claim is because it is clear that in our Eleventh Circuit, fishermen and fishing boat owners can sue for non-impact economic loss notwithstanding the Robins Dry Dock

---

[74]   2A LEGISLATIVE HISTORY OF THE SUPERFUND AMENDMENTS AND REAUTHORIZATION ACT OF 1986, at 1180 (Committee on Env't & Public Works ed., 1990) (emphasis added).  *See also* S. Olssen, Recovery for the Lost Use of Water Resources: M/V TESTBANK on the Rocks?, 67 TUL.L.REV. 271 (1992) ("Though Senator Bentsen specifically refers to liability for ocean incineration vessels, the plain wording of § 9607(h) does not contain any limiting language which would suggest that it is only applicable to ocean incineration vessels").

[75]  H.R.CONF.REP. 99-962, 99th Cong., 2nd Sess. 1986 U.S.C.C.A.N.3068, 1985 WL 25940.

[76]  S. Olssen, Recovery for the Lost Use of Water Resources: M/V TESTBANK on the Rocks?, 67 TUL.L.REV. 271, 300 (1992).

rule.[77]  Although in the *Fifth* Circuit it may not yet be clear,[78] we are in the *Eleventh* Circuit.

Plaintiffs allege that they "derive substantial income from . . . harvesting various types of seafood

from Gulf Waters" and to be the owner of a seafood processing facility.  So since this suit is in the

Eleventh Circuit, that allegation alone is enough to support a holding for purposes of a motion to

dismiss for failure to state a claim, that this suit is not barred by the Rule in Robins Dry Dock if

admiralty law applies.  If the line is drawn more precisely, it should be later.

### B.    Alabama Law Does Not Import Robins Dry Dock.

We don't read defendant's briefs to claim that Alabama substantive law applies the rule in

Robins Dry Dock, but it doesn't.  Now that it has been overruled by Congress, we doubt that

Alabama will rush to apply it.

### CONCLUSION

The motions to dismiss or for more definite statement are unsound and should be denied.

---

[77] Miller Indus v Caterpillar Tractor, 733 F.2d 813, 820 (11th Cir. 1984).

[78] State ex rel Guste v M/V TESTBANK, 752 F.2d 1019, 1027 n.10 (5th Cir. 1985) (en banc) (issue left open), with the issue left open again by the panel in In re Taira Marine Ltd No 5, LLC, 444 F.3d 371, 376 (5th Cir. 2006).

Respectfully submitted,


/s/ David A. Bagwell
DAVID A. BAGWELL
BAGWD4453
Mail
Post Office Box 2126
Fairhope, Alabama  36533
Express:
400 Fairhope Ave., Ste 2E
Fairhope, Alabama  36532
251-928-2970
251-928-6597 (fax)
david@bagwellesq.com
Additional Counsel for Plaintiffs

/s/ Robert T. Cunningham
ROBERT T. CUNNINGHAM
GEORGE W. FINKBOHNER, III
STEPHEN C. OLEN
/s/ Steven Nicholas
STEVEN L. NICHOLAS
LUCY E. TUFTS
Cunningham Bounds, LLC
1601 Dauphin Street
Mobile, Alabama  36604
251-471-6191
251-479-1031 (fax)
Counsel for Plaintiffs


## CERTIFICATE OF SERVICE

I hereby certify that I have on this July 2, 2010 electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF System which will automatically serve the same via email on the parties listed as counsel of record in the CM/ECF System.  I have also caused to be served additional parties involved in this litigation as indicated below.


LIGHTFOOT, FRANKLIN & WHITE, LLC
William H. Brooks
Adam K. Peck
John M. Johnson
Marchello Dewaun Gray
400 North 20th Street
Birmingham, Alabama 35203
wbrooks@lightfootlaw.com
apeck@lightfootlaw.com
jjohnson@lightfootlaw.com
mgray@lightfootlaw.com
*Attorneys for BP America, Inc;, BP*
*Exploration & Production, Inc.; BP*
*Products North America, Inc.*

HAND ARENDALL, LLC
Douglas L. McCoy
Blane H. Crutchfield
Post Office Box 123
Mobile, Alabama 36601
dmccoy@handarendall.com
bcrutchfield@handarendall.com

*Attorneys for Transocean Deepwater, Inc.;*
*Transocean Offshore Deepwater Drilling,*
*Inc.;*
*Transocean Holdings, LLC*

KIRKLAND & ELLIS, LLP
Richard C. Godfrey
John T. Hickey, Jr.
James Andrew Langan
300 N. LaSalle
Chicago, Illinois 60654
richard.godfrey@kirkland.com
john.hickey@kirkland.com
andrewlangan@kirkland.com
**_Attorneys for BP America, Inc.; BP_**
**_Exploration & Production, Inc.; BP_**
**_Products North America, Inc._**


BP PLC
1 St. James's Square
London
SW1Y 4PD
**_Defendant, BP PLC_**


GODWIN RONQUILLO
Donald E. Godwin
Bruce W. Bowman, Jr.
Floyd R. Hartley, Jr.
Gavin Eugene Hill
Jenny L. Martinez
1201 Elm Street, Suite 1700
Dallas, Texas 75270
dgodwin@rodwinronquillo.com
bbowman@godwinronquillo.com
fhartley@godwinronquillo.com
ghill@godwinronquillo.com
jmartinez@godwinronquillo.com
**_Attorneys for Halliburton Energy Services,_**
**_Inc._**

BECK, REDDEN & SECRET, LLP
David J. Beck
One Houston Center
1221 McKinney Street, Suite 4500
Houston, Texas 77010
dbeck@brsfirm.com
**_Attorneys for Cameron International_**
**_Corporation_**


FRAZER, GREENE, UPCHURCH &
BAKER, LLC
Albert Danner Frazer, Jr.
Robert J. Mullican
Post Office Box 1686
Mobile, Alabama 36633
adf@frazergreene.com
rjm@frazergreene.com
**_Attorneys for Cameron International_**
**_Corporation_**


STARNES, DAVIS & FLORIE, LLP
Randal H. Sellers
Bryan Glen Hale
Post Office Box 598512
Birmingham, Alabama 35259
rsellers@starneslaw.com
bgh@starneslaw.com
**_Attorneys for Cameron International_**
**_Corporation_**

GODWIN RONQUILLO
Robert Alan York
1331 Lamar, Suite 1665
4 Houston Center
Houston, Texas 77010
ayork@godwinronquillo.com
*Attorneys for Halliburton Energy Services, Inc.*

HELMSING, LEACH, HERLONG,
NEWMAN & ROUSE, PC
John N. Leach, Jr.
Joseph P.H. Babington
Russell C. Buffkin
Post Office Box 2767
Mobile, Alabama 36652
jnl@helmsinglaw.com
jpb@helmsinglaw.com
rcb@helmsinglaw.com
*Attorneys for Halliburton Energy Services, Inc.*

STARNES, DAVIS & FLORIE, LLP
M. Warren Butler
Post Office Box 1548
Mobile, Alabama 36633
wbutler@starneslaw.com
*Attorneys for Cameron International Corporation*

The following parties who are involved in this litigation but not included on the CM/ECF service list were served by Plaintiffs' counsel:

- Adam K. Peck  *(via email)*
- John M. Johnson  *(via email)*
- Floyd R. Hartley, Jr. *(via email)*
- Gavin Eugene Hill  *(via email)*
- Robert Alan York *(via email)*
- Randal H. Sellers *(via email)*
- Bryan Glen Hale *(via email)*
- M. Warren Butler *(via email)*
- BP PLC *(via U.S. Mail)*

/s/ David A. Bagwell
**DAVID A. BAGWELL**