IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BILLY WILKERSON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 1:10-cv-00201-KD-C |
| ) | |
| TRANSOCEAN HOLDINGS, INC., et al., ) | |
| ) | |
| Defendants. ) | |

**HALLIBURTON ENERGY SERVICES, INC.'S REPLY IN SUPPORT OF
ITS MOTION TO DISMISS AND, ALTERNATIVELY,
FOR A MORE DEFINITE STATEMENT**

Defendant, Halliburton Energy Services, Inc. ("HESI"), respectfully files this Reply in response to Plaintiffs' Opposition to HESI's Motion to Dismiss or For More Definite Statement ("Opposition").

## I. INTRODUCTION AND SUMMARY

The Deepwater Horizon incident, and Plaintiffs' claims allegedly resulting therefrom, are intensely maritime in nature. At its heart, this case is about a "vessel" that caught fire, exploded and sank, and the oil spill that resulted from that incident. As Plaintiffs concede, the incident occurred well beyond any state's territorial waters in the deep water of the Gulf of Mexico.[1] Plaintiffs' asserted damages are dominated by the allegation that the oil spill is damaging the environment of the Gulf of Mexico, thereby preventing them from engaging in maritime activity of their own—"harvesting various types of seafood from Gulf Waters." (Complaint ¶¶ 5-7, 9-11).

---
[1] Opposition at 2.

The thrust of Plaintiffs' Opposition is that a key determination in this case—whether Plaintiffs' claims arise under the Court's admiralty jurisdiction—is too fact intensive to be decided at this stage of litigation. That contention is specious. Indeed, it runs counter to the guidance of the United States Supreme Court's controlling decisions. Plaintiffs' claims clearly arise under the Court's admiralty jurisdiction and, therefore, maritime law applies, not state law. The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331, *et seq.,* does not alter this outcome as its "adjacent state law" provision does not apply.

Plaintiffs' maritime claims are preempted by the Oil Pollution Act ("OPA") of 1990, 33 U.S.C. §§ 2701, *et seq.,* not because OPA preempts *all* maritime claims, but because OPA preempts maritime claims seeking damages of the type alleged by Plaintiffs.

While Plaintiffs may be able to recover economic damages under OPA, the economic loss rule established in *Robins Dry Dock* precludes their recovery of such damages under maritime law.

Finally, Plaintiffs' claims should be dismissed for their utter failure to meet the applicable pleading requirements of Rule 8.

## II.   ARGUMENTS AND AUTHORITY

A.   **Plaintiffs' Claims, if Any, Arise Under the Court's Admiralty Jurisdiction.**

A critical issue in this litigation is the issue of whether Plaintiffs' claims, if any, arise under the Court's admiralty jurisdiction. Plaintiffs' claims cannot arise under both state law and admiralty law.[2] Indeed, Plaintiffs concede that "if there is admiralty jurisdiction, then it normally ousts state law from its own application."[3] Plaintiffs cite case law with holdings based on

---

[2] Opposition at 1.

[3] *Id.* at 15 and n.34. *See also Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 255 (1972) ("With admiralty jurisdiction comes the application of substantive admiralty law.")

factually diverse patterns, attempting to bolster their argument that this critical jurisdictional/choice of law determination cannot be decided at this stage of litigation. However, their argument runs afoul of the Supreme Court's decision in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995), which provides the Court with the proper analytical framework to make this determination. Pursuant to *Grubart*,[4] Plaintiffs' claims clearly arise under the Court's admiralty jurisdiction. Thus, Plaintiffs' claims are governed by maritime law, not "state law of its own force."

In *Grubart*, the Supreme Court reiterated the current test for admiralty tort jurisdiction, stating that "a party seeking to invoke federal admiralty jurisdiction . . . over a tort claim must satisfy conditions of both [i] location and of [ii] connection with maritime activity." 513 U.S. at 534.[5] To satisfy, the location test, the Court must determine only "whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Id.* As the Deepwater Horizon clearly was a "vessel" on navigable water, the location test is easily satisfied, and Plaintiffs concede as much.[6]

---

[4] Plaintiffs have alternatively referred to this case as "*Grubert*" [sic] and "*Great Lakes Dredge*" in their Opposition. *See, e.g.*, Opposition at 15, 15 n.36. HESI will refer to the case as "*Grubart*."

[5] Arguing that it is too complicated to determine at this stage of the litigation whether a sufficient maritime nexus exists, Plaintiffs cite *Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.,* 644 F.2d 1132, 1135 (5th Cir. 1981). *See generally,* Opposition at 17-21. *Sohyde* and its progeny determined admiralty jurisdiction on the basis of a four-factor test first adopted by the Fifth Circuit in *Kelly v. Smith,* 485 F.2d 520, 525 (5th Cir. 1973). This test required courts to consider factually intensive factors such as: "(i) [t]he functions and roles of the parties; (ii) the types of vehicles and instrumentalities involved; (iii) the causation and type of injury; and (iv) traditional concepts of the role of admiralty law." *Kelly*, 485 F.2d at 525. *Sohyde*, however, has subsequently been limited to its unique facts, *see Broughton Offshore Drilling, Inc., v. South Central Machine, Inc.*, 911 F.2d 1050, 1053 (5th Cir. 1990) (declining to extend *Sohyde* "beyond its factual setting"), which facts include a blowout incident in a canal slip approximately eight feet deep within the State of Louisiana, 644 F.2d at 1134, and alleged damages to property "indistinguishable from those arising from land-based blow-outs[,]" *id.* at 1138. Importantly for present purposes, the fact-intensive inquires set forth in *Kelly* and its progeny were specifically abrogated by the U.S. Supreme Court in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995). *See infra* at 6 and note 14.

[6] Opposition at 16 ("There was clearly a maritime *locality* for this incident . . . . So locality is not an issue here.")(emphasis in original).

With respect to the "connection with maritime activity" test, the Supreme Court in *Grubart* explained that the test raises two "*Sisson* inquiries."[7] Under the first *Sisson* inquiry, the Court must "assess the general features of the type of incident involved . . . to determine whether the incident has a potentially disruptive impact on maritime commerce." *Id.* (quotations and citations omitted). The Court in *Grubart* stressed that this inquiry focuses "*not on the specific facts* at hand but on whether the '*general features*' of the incident were 'likely to disrupt commercial activity.'" *Id.* at 538 (citing *Sisson v. Ruby*, 497 U.S. 358, 363 (1990)) (emphasis added). The *Grubart* Court found that the general features of that case—namely "damage by a vessel in navigable water to an underwater structure"—plainly constituted "the kind of incident that has a potentially disruptive impact on maritime commerce." *Id.* (citations omitted).

The facts alleged by Plaintiffs are at least as potentially disruptive of commercial maritime activity. Plaintiffs allege, among other things, that defendants were negligent with respect to their operation of and activities aboard the vessel, the Deepwater Horizon,[8] and allege damages predominantly to the natural resources of the Gulf of Mexico,[9] a body of water "teeming with maritime activity."[10] Indeed, the incident reportedly has disrupted commercial maritime activity, as demonstrated by: (1) the sinking of the vessel;[11] (2) the resultant oil spill

---

[7] "*Sisson* inquiries" refer to inquiries developed by the Supreme Court in the case of *Sisson v. Ruby*, 497 U.S. 358 (1990), which also dealt with the issue of whether claims arose under federal admiralty jurisdiction. The Supreme Court in *Grubart* advanced the analysis further, but retained the *Sisson* inquiries as part of the admiralty jurisdiction analysis. *See Grubart*, 513 U.S. at 533-34.

[8] *See, e.g.,* Complaint ¶¶ 43(a)-(d), (f)-(i), (k)-(l), (n).

[9] *Id.* ¶¶ 29-30 (alleging that the oil spill is "a dangerous environmental contamination" and is "caus[ing] loss of revenue to persons and businesses who are being prevented from using the Gulf of Mexico and Alabama's adjoining beaches for diverse activities, including work and to earn a living.")

[10] *Broughton,* 911 F.2d at 1053.

[11] Complaint ¶ 1.

4

and the shut down of commercial fishing in certain areas of the Gulf of Mexico;[12] and (3) the response efforts by numerous other vessels dispatched to assist in capping the well and clean up efforts.[13] This *Sisson* prong of the maritime nexus inquiry is satisfied.

Under the second *Sisson* inquiry, the Court must "determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Id.* (quotations and citations omitted). Importantly, the Supreme Court's directive is directly contrary to Plaintiffs' argument that the Court must gather more facts to determine whether admiralty jurisdiction applies. Deciding in favor of using the *Sission* inquiries (which seek to characterize the *general nature* of an incident to determine admiralty jurisdiction), the Supreme Court expressly abrogated more fact-intensive 4- and 7-factor "maritime nexus" tests applied by the Fifth Circuit,[14] stating that use of such tests "would be hard to apply, jettisoning relative predictability for the open-ended rough-and-tumble of factors, inviting complex argument in a trial court and virtually inevitable appeals." *Id.* at 547. Thus, the appropriate analysis focuses on the general nature of the incident and does not require greater factual development.

For example, in *Grubart,* the Supreme Court described the general character of the activity as "repair or maintenance work on a navigable waterway performed from a vessel." *Id.* at 540. The Court further noted that "[n]avigation of boats in navigable waters clearly falls within the substantial [maritime] relationship[.]" *Id.* Likewise, here, the general character of the

---

[12] *See* "The Ongoing Administration-Wide Response to the Deepwater BP Oil Spill," dated July 14, 2010, at 2, available on the official website of the Deepwater Horizon Unified Command at http://deepwaterhorizonresponse.com/go/doc/2931/783735, and a copy of which is attached hereto as Exhibit 1.

[13] *See* Exhibit 1.

[14] *Grubart*, 513 U.S. at 544 (addressing the factually intensive 4-factor test announced in *Kelly v. Smith*, 485 F.2d 520, 525 (5th Cir. 1972), and the 7-factor test set forth in *Molett v. Penrod Drilling Co.*, 826 F.2d 1419, 1426 (5th Cir. 1973)).

defendants' activities could be described as *oil and gas drilling on a navigable waterway performed from a vessel*. Clearly, the general character of the Deepwater Horizon incident shows a substantial relationship to general maritime activity.[15]

To determine whether admiralty jurisdiction applies, the Court is not, as Plaintiffs argue, required to decide whether this is a "vessel case," a "seabed case," a "blowout" case or a case of any other factual permutation.[16] Rather, the general nature of the Deepwater Horizon incident controls. Moreover, even if some defendants were engaged in traditionally maritime activities and some were not, the "substantial relationship to maritime activity" test is satisfied "when at least one alleged tortfeasor was engag[ed] in activity substantially related to traditional maritime activity and such activity is claimed to have been a proximate cause of the incident." *Grubart,* 513 U.S. at 541. Here, defendants include the Transocean entities, which Plaintiffs allege "are the owners and/or operators of the Deepwater Horizon[.]" (Complaint ¶ 21) Plaintiffs further assert that defendants "fail[ed] to properly operate the Deepwater Horizon; [o]perat[ed] the Deepwater Horizon in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill; fail[ed] to timely bring the oil release under control; [and] operat[ed] the Deepwater Horizon with untrained and/or unlicensed personnel[.]" (Complaint ¶¶ 43, 49) Thus, on the basis of Plaintiffs' pleadings, at least one alleged tortfeasor was engaged in traditional maritime activity—operating a vessel in navigable waters—and such activity is claimed to have been a proximate cause of the incident. Thus, admiralty jurisdiction applies.

The admiralty jurisdiction test set forth in *Grubart* is not affected by the nature of the Plaintiffs—land-based claimants—or their alleged damages. First, Plaintiffs' alleged damages—

---

[15] *See also* Defendant HESI's Memorandum in Support of Its Motion to Dismiss at 11 (citing prior case law finding that oil and gas drilling has a substantial relationship to general maritime activity).

[16] Opposition at 17, 21.

predicated on allegations of harm to the natural resources of the Gulf of Mexico—are themselves intensely maritime. Second, even assuming Plaintiffs have alleged direct injury to personal or real property, admiralty jurisdiction over their claims would still apply maritime law in lieu of substantive state law by virtue of the Admiralty Extension Act, 46 U.S.C. § 30101.[17] As the Supreme Court has explained, "[t]he purpose of the [Admiralty Extension Act] was to end concern over the sometimes confusing line between land and water, by investing admiralty with jurisdiction over 'all cases' where the injury was caused by a ship or other vessel on navigable water, even if such injury occurred on land." *Grubart*, 513 U.S. at 532.

Admiralty jurisdiction clearly attaches of its own force to any claims Plaintiffs may have arising out of the Deepwater Horizon incident. Such claims are fundamentally maritime in nature and, therefore, arise under maritime law to the exclusion of state law.

### B. The Outer Continental Shelf Lands Act Does Not Apply "Adjacent State Law" to Plaintiffs' Claims.

The only other basis on which state law could apply to Plaintiffs' claims is pursuant to the "adjacent state law" provision of OCSLA, which applies, as a proxy for federal law, the law of the adjacent state *in certain situations* on the Outer Continental Shelf. *See* 43 U.S.C. § 1333(a)(2)(A). The "adjacent state law" provision of OCSLA does not apply in this case because the Deepwater Horizon was neither an "artificial island" nor "fixed structure" erected on subsoil or seabed of the Outer Continental Shelf.

As a threshold matter, even Plaintiffs concede that, if maritime law applies to Plaintiffs' claims (and it does, *see supra*, Section A), OCSLA's adjacent state law provision does not

---

[17] The Admiralty Extension Act, which used to be codified at 46 U.S.C. § 740, has now been recodified at 46 U.S.C. § 30101.

apply.[18] That salient point is reinforced by the statutory text of OCSLA, which contains two relevant but significantly different statutory provisions—Section 1333(a)(1) and 1333(a)(2)(A).

Section 1333(a)(1) of OCSLA contains a very broad exertion of federal control and authority over virtually all activities occurring on the Outer Continental Shelf involving the exploration, development, production and transportation of resources. That exertion of federal control is extended to "the subsoil and seabed of the outer Continental Shelf and to all artificial islands, *and all installations and other devices permanently or temporarily attached to the seabed*[.]" 43 U.S.C. § 1333(a)(1) (emphasis added). The Deepwater Horizon, a *vessel*, fairly falls within the language of a "device . . . temporarily attached to the seabed[.]" Thus, the vessel and its operations were subject to federal control and authority, rendering the regulations promulgated pursuant to OCSLA applicable insofar as they governed Mobile Offshore Drilling Units (MODUs), like the Deepwater Horizon, engaged in drilling operations on the OCS.

In stark contrast, § 1333(a)(2)(A) of OCSLA separately applies the "laws of each adjacent state" on the Outer Continental Shelf in a much narrower set of circumstances. That provision provides, in relevant part, that the law of the adjacent state applies "to that portion of the subsoil and seabed of the outer Continental Shelf, and *artificial islands* and *fixed structures* erected thereon[.]" (emphasis added). Conspicuously absent is the language contained in § 1333(a)(1) pertaining to "all installations and other devices permanently or temporarily attached to the seabed." Rather, § 1333(a)(2)(A) has a narrower reach, applying adjacent state law to "artificial islands" and "fixed structures," not to vessels like the Deepwater Horizon.[19] As set

---

[18] *See* Opposition at 22 (stating that OCSLA borrows adjacent state law as surrogate federal law in certain cases, "*if admiralty law does not apply in them*." (emphasis added)). *See also* HESI's Memorandum in Support of Its Motion to Dismiss at 7-12 (explaining that, pursuant to OCSLA, adjacent state law does not apply to claims where federal maritime law applies of its own force).

[19] It is not surprising that the scope of §§ 1333(a)(1) and 1333(a)(2)(A) should be different. The very broad exertion of federal authority under § 1333(a)(1) necessarily encompasses all mineral exploration and production activities on

forth in HESI's Memorandum in Support of Its Motion to Dismiss, the Deepwater Horizon was neither an artificial island nor a fixed structure. It was a vessel,[20] and Plaintiffs agree.[21] Therefore, § 1333(a)(2)(A) does not apply "adjacent state law" in this case.[22]

### C. The Oil Pollution Act of 1990 ("OPA") is Plaintiffs' Exclusive Remedy for the Damages They Allege.

Because Plaintiffs' claims are governed by maritime law, they are preempted or displaced by OPA. Plaintiffs argue that OPA does not preempt their maritime claims and cite to OPA's "Savings Provision," 33 U.S.C. § 2751, in support. However, Plaintiffs' superficial gloss is unavailing and ignores the express language in the first phrase of this statutory provision.

---

the Outer Continental Shelf, whether performed by "fixed platforms" or "vessels," in order to maximize federal control over vital national resources. However, maritime law has historically governed claims arising on or in connection to a vessel, *see Sisson,* 497 U.S. at 360-61, and so § 1333(a)(2)(A)'s application of adjacent state law is only needed to fill the gap where claims arise on or in connection with a *non-vessel—i.e.*, an artificial island or fixed structure—such as a fixed platform.

[20] *See* HESI's Memorandum in Support of Its Motion to Dismiss at 8-10.

[21] Opposition at 16-17 ("There are plenty of cases in the Fifth and the Eleventh Circuits holding [rigs like the Deepwater Horizon] to be 'vessels' . . . That seems clearly to cover the Deepwater Horizon. We doubt that anybody will claim otherwise. We sure don't.")

[22] Even if § 1333(a)(2)(A) were to apply in this case, Louisiana law likely would apply as adjacent state law, not Alabama law. In *Snyder Oil Corp. v. Samedan Oil Corp.,* the court considered four kinds of evidence to determine which state was considered "adjacent" to an OCSLA situs: (1) geographic proximity; (2) which coast federal agencies consider the subject platform to be "off of"; (3) prior court determinations; and (4) projected boundaries. 208 F.3d 521, 524 (5th Cir. 2000). Louisiana is closer to the situs of the Deepwater Horizon incident than any other state, including Alabama, and the Minerals Management Service (MMS) (n/k/a Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE)) has described the Deepwater Horizon incident as occurring "50 miles offshore Louisiana" on its official website linking a webpage describing the Deepwater Horizon incident, http://www.mms.gov/DeepwaterHorizon.htm, a copy of which is attached hereto as Exhibit 2. Similarly, in a notice entitled "Information to Lessees and Operators on Federal Oil and Gas Leases on the Outer Continental Shelf, Gulf Mexico Region," dated April 28, 2010, MMS notified lessees and operators in the Gulf of Mexico about its intention to initiate controlled burns to abate the oil spill and described the oil spill as being "located offshore Louisiana." *See* https://www.gomr.mms.gov/homepg/regulate/regs/itls/100428.pdf, a copy of which is attached hereto as Exhibit 3. In addition, federal district courts have noted that other locations in the Mississippi Canyon are adjacent to the State of Louisiana and have applied Louisiana law as surrogate federal law. *See, e.g., Ronquille v. MMR Offshore Svcs, Inc.*, 353 F. Supp. 2d 680, 682 n.4 (E.D. La. 2004); *Dennis v. Bud's Boat Rental, Inc.*, 987 F. Supp. 948, 949-954 (E.D. La. 1997). Therefore, even if OCSLA were to apply adjacent state law in this case, it likely would apply Louisiana, not Alabama law.

Section 2751 provides:

> ***Except as otherwise provided in this Act***, this Act does not affect – (1) admiralty and maritime law; or (2) the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors all other remedies to which they are otherwise entitled.

33 U.S.C. § 2751(e) (emphasis added).  Plaintiffs read the "Savings Provision" as if the first phrase does not exist.

In doing so, Plaintiffs fall into the trap recognized by the court in *Gabarick v. Laurin Maritime (America), Inc.*, 623 F. Supp. 2d 741 (E.D. La. 2009).  In *Gabarick*, the court held that "all claims that are recoverable under OPA, specifically those covered damages enumerated in 33 U.S.C. § 2702, are preempted by OPA."  *Id*. at 750-51.  Addressing the issue of OPA preemption of maritime claims, the court noted that "[c]laimants[] ignore[] the first part of *section (e)* . . . [and] cloud the issue at bar by arguing that OPA does not preempt general maritime law claims rather than focusing on preemption solely of the damages specifically covered by OPA."  *Id.* at 746.  Plaintiffs attempt to similarly cloud the issues here.  As the court in *Gabarick* explained, consistent with the text of the savings clause, OPA does not preempt all general maritime claims.  Rather, it preempts those maritime claims *seeking damages of the type recoverable under OPA. Id.* at 746-47.[23]  Thus, the savings provision, properly interpreted, provides that OPA does not affect admiralty and maritime law, *except* with respect to claims for damages of the types recoverable under OPA.  *Id.* at 746.

In this case, Plaintiffs allege generally "loss of revenue" based on "dangerous contamination of the Gulf of Mexico and its shorelines." (Complaint ¶¶ 29, 30)  Such damages

---

[23] Thus, for example, as OPA does not cover bodily injury claims or collision damage, or Exoneration/Limitation Petitions, the savings provision operates to preserve such maritime claims, and OPA does not preempt them. *Gabarick*, 623 F. Supp. at 745. *See also Tanguis v. M/V WESTCHESTER*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) (noting that "certain maritime remedies are preempted by OPA, while others survive").

are recoverable under 33 U.S.C. § 2702(b) of OPA and, therefore, Plaintiffs' maritime claims seeking such damages are preempted.

### D.     *Robins Dry Dock* and the Economic Loss Rule Bar Plaintiffs' Claims

Ironically, OPA provides a basis for Plaintiffs' recovery from a "responsible party" for legitimate economic damages caused by the oil spill.  Plaintiffs' Opposition does nothing to refute that the "economic loss rule" applies to preclude their recovery of such damages under maritime law.

Plaintiffs cite no authority, and HESI cannot locate any authority, for the proposition that § 9607(h) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601, *et seq.*, abrogates the economic loss rule announced in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 309 (1927).  Even if such authority exists, it does not apply to HESI.  Plaintiffs allege no CERCLA claim(s) against HESI or any defendant, so the statute is irrelevant to this case.  Even if Plaintiffs were to bring CERCLA claims, the plain text of § 9607(h) purports to apply only to "[t]he owner or operator of a vessel." 42 U.S.C. § 9607(h) ("***The owner or operator of a vessel*** shall be liable in accordance with this section . . . .") (emphasis added).  HESI was neither the "owner" nor the "operator" of the Deepwater Horizon, as Plaintiffs' concede.[24]

Plaintiffs attempt further to discredit the application of *Robins Dry Dock*'s economic loss rule by stretching the holding and facts of *Shaughnessy v. PPG Indus., Inc.*, 795 F. Supp. 193 (W.D. La. 1992), beyond recognition.  While the court in *Shaughnessy* did not apply the economic loss rule to preclude a fishing guide's economic damage claims, that case involved a land-based plaintiff, a land-based polluter and actual damage to the claimant's riparian property.

---

[24] Complaint ¶ 21 (alleging that Transocean defendants "are the owners and/or operators of the Deepwater Horizon").

11

795 F. Supp. at 195-96. Moreover, the claimant's claims against the polluter proceeded under Louisiana state law, not maritime law. *Id.* at 195. Indeed, courts have distinguished *Shaughnessy* on this basis and found it inapplicable in maritime cases such as this one. *See, e.g., In re Exxon Valdez,* No. A89-0095, 1994 U.S. Dist. LEXIS 6009, at *8 n.7 (D. Alaska Mar. 23, 1994); *La. Crawfish Producers Ass'n v. Amerada Hess Corp.*, 935 So. 2d 380, 383 (La. App. 3rd Cir. 2006). As noted in *Shaughnessy*, "the rule of *Robins Dry Dock* has been contained in this country primarily *to torts in admiralty* and in fact has been referred to as 'the general rule in maritime law.'" 795 F. Supp. at 195 (emphasis added). *Shaughnessy* provides no guidance on the issues in this case, nor does it erode the applicability of the economic loss rule in maritime cases such as this.

**E.     The Complaint Fails to Meet Rule 8's Applicable Pleading Requirements.**

Plaintiffs contend that their allegations against Defendants satisfy the requirements of Rule 8 and attempt to minimize the import of the United States Supreme Court's recent clarifications of that rule in *Twombly*[25] and *Iqbal*.[26] However, as the Supreme Court acknowledged in *Iqbal,* the *Twombly* holding represented a real change in the Supreme Court's application of Rule 8. *See Iqbal,* 129 S. Ct. at 1944 (noting that "*Twombly* retired the *Conley* no-set-of-facts test"). Thus, *Twombly* and *Iqbal* represent more than a mere "buzz among the defense bar" that the Supreme Court has reconsidered its interpretation of Rule 8. As set forth in HESI's Memorandum in Support of its Motion to Dismiss, Plaintiffs' claims should be dismissed based on their conclusory nature and lack of factual enhancement.

Plaintiffs' allegations are equally deficient in their attempt to ascribe all allegations to all defendants, a propensity further reflected in their Opposition to various defendants' motions to

---

[25] *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007).

[26] *Ashcroft v. Iqbal,* ___ U.S. ___, 129 S. Ct. 1937 (2009).

dismiss in a single brief. This approach also is reflected in Plaintiffs' somewhat flippant statement that "[e]verybody in America *except apparently these defendants* knows that in this deal there is 'more than a sheer possibility that a defendant has acted unlawfully.'" (Opposition at 4) (emphasis in original).

The Complaint contains a lengthy list of alleged acts and/or omissions in support of Plaintiffs' claims,[27] but Plaintiffs fail to ascribe these acts/omissions to any specific defendant(s), providing another reason why their claims require dismissal. *See Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) ("The complaint is a quintessential 'shotgun' pleading. . . . [It] is replete with allegations that 'the defendants' engaged in certain conduct, making no distinction among the fourteen defendants charged"); *Lane v. Capital Acquisitions and Management Co.,* No. 04-60602 CIV, 2006 LEXIS 96422, at *16 (S.D. Fla. Apr. 14, 2006) (finding that a complaint that lumps all the defendants together in each claim and provides no factual basis to distinguish their conduct falls short of the requirements of Rule 8).

Like the complaints in *Magluta* and *Lane,* the present Complaint requires HESI to guess which of Plaintiffs' conclusory allegations is asserted against it. Notwithstanding Plaintiffs' apparent suggestion that the extensive media coverage of events related to the Deepwater Horizon incident has put defendants on sufficient notice of Plaintiffs' claims, Rule 8, as interpreted by the Supreme Court, exacts more precise notice and pleading standards. Plaintiffs fail to meet them here, and their claims should be dismissed.

---

[27] *See, e.g.*, Complaint ¶¶ 43(a)-(p), 49(a)-(p).

### III.     CONCLUSION

For the reasons set forth above and in HESI's Memorandum in Support of Its Motion to Dismiss, Plaintiffs' claims should be dismissed as a matter of law pursuant to Rule 12(b)(1) and Rule 12(b)(6).  Alternatively, Plaintiffs should be required to file a more definitive statement of their pleading pursuant to Rule 12(e).

Respectfully submitted this 23rd day of July, 2010.

**GODWIN RONQUILLO PC**

DONALD E. GODWIN (GODWD 5022) (*pro hac vice*)
Email  dgodwin@godwinronquillo.com
BRUCE W. BOWMAN, JR. (*pro hac vice*)
Email  bbowman@godwinronquillo.com
JENNY L. MARTINEZ (*pro hac vice*)
Email  jmartinez@godwinronquillo.com
FLOYD R. HARTLEY, JR. (*pro hac vice*)
Email  fhartley@godwinronquillo.com
GAVIN E. HILL (*pro hac vice*)
Email  ghill@godwinronquillo.com
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
Telephone: 214.939.4400
Facsimile: 214.760.7332

and

R. ALAN YORK (*pro hac vice*)
Email  ayork@godwinronquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

and

        **s/ Joseph P. H. Babington**
JOHN N. LEACH  (LEACJ2634)
Email  jnl@helmsinglaw.com
JOSEPH P. H. BABINGTON  (BABIJ7938)
Email  jpb@helmsinglaw.com
RUSSELL C. BUFFKIN  (BUFFR6510)
Email  rcb@helmsinglaw.com
**HELMSING, LEACH, HERLONG, NEWMAN & ROUSE, P.C.**
Post Office Box 2767
Mobile AL 36652
Telephone:  251.432.5521
Facsimile:  251.432.0633

**ATTORNEYS FOR DEFENDANT, HALLIBURTON ENERGY SERVICES, INC.**

**CERTIFICATE OF SERVICE**

       I hereby certify that I have on this 23rd day of July, 2010, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the court's electronic filing system. I also certify that I have mailed this filing by United States Postal Service to all counsel of record who are not registered to receive electronic service by operation of the court's electronic filing system.

Robert T. Cunningham, Jr., Esquire
Steve Olen, Esquire
Steven L. Nicholas, Esquire
Lucy Elizabeth Tufts, Esquire
CUNNINGHAM, BOUNDS, LLC
Post Office Box 66705
Mobile, AL 36660
*Counsel for Plaintiffs*

George R. Irvine, III, Esquire
STONE, GRANADE & CROSBY, PC
7133 Stone Drive
Daphne, AL 36526
*Counsel for Plaintiffs*

David A. Bagwell, Esquire
400 Fairhope Avenue, Suite 2E
Fairhope, AL  36532
*Counsel for Plaintiffs*

John M. Johnson, Esquire
Adam K. Peck, Esquire
William H. Brooks, Esquire
Marchello D. Gray, Esquire
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
400 North 20th Street
Birmingham, AL 35203
*Counsel for BP America, Inc.,*
*BP Products North America, Inc. and*
*BP Exploration and Production, Inc.*

Richard C. Godfrey, Esquire
John T. Hickey, Jr., Esquire
James Andrew Langan, Esquire
KIRKLAND & ELLIS, LLP
300 N. LaSalle
Chicago, IL 60654
*Counsel for BP America, Inc.,*
*BP Products North America, Inc. and*
*BP Exploration and Production, Inc.*

A. Danner Frazer, Jr., Esquire
Robert J. Mullican, Esquire
FRAZER GREENE UPCHURCH & BAKER
Post Office Box 1686
Mobile, AL  36633
*Counsel for Cameron International Corp.*

David J. Beck, Esquire
BECK, REDDEN & SECRET, LLP
One Houston Center
1221 McKinney Street, Suite 4500
Houston, TX 77010
*Counsel for Cameron International Corp.*

Blane H. Crutchfield, Esquire
Douglas L. McCoy, Esquire
HAND ARENDALL LLC
Post Office Box 123
Mobile, AL 36601
*Counsel for Transocean Deepwater, Inc. and*
*Transocean Deepwater Offshore Drilling,*
*Inc. and Transocean Holdings LLC*

Transocean, Inc.
The Prentice Hall Corporation System, Inc.
2711 Centerville Road, Suite 400
Wilmington, DE  19808

BP plc
International Headquarters
1 St. James Square
London, SW1Y 4PD  UK

                          **s/ Joseph P. H. Babington**
                          Of counsel