IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DISTRICT

| | | |
|---|---|---|
| **BILLY WILKERSON, et al.** | * | |
| | * | |
| Plaintiffs, | * | |
| | * | **CV-10-00201-KD-C** |
| v. | * | |
| | * | |
| **TRANSOCEAN HOLDINGS, INC., et al.,** | * | |
| | * | |
| Defendants. | * | |
| | * | |

**REPLY OF DEFENDANT CAMERON INTERNATIONAL
IN SUPPORT OF ITS MOTION TO DISMISS
THE COMPLAINT FOR FAILURE TO STATE A CLAIM**

In accordance with the Court's order dated June 29, 2010 [Doc. 66], but subject to its motion for a stay [Doc. 59], Defendant Cameron International Corporation ("Cameron") respectfully submits this reply memorandum in support of its motion [Doc. 57] to dismiss the Complaint for failure to state a claim and in response to the Brief of Plaintiffs in Opposition to Motions to Dismiss or for More Definite Statement [Doc. 73; hereafter referred to as "Plaintiffs' Brief" and cited as "Pls. Br."].

**Summary of Reply**

Plaintiffs make no attempt at all to show that their allegations against Cameron satisfy Federal Rule 8 as definitively interpreted by the Supreme Court in *Twombly* and *Iqbal*. *Compare* Pls. Br., pp. 3-4, *with* Cameron Br., pp. 10-11. Tellingly, Plaintiffs do not point to a single "factual enhancement" in their Complaint beyond "naked assertions" against Cameron. As the Supreme Court has now said twice over, this type of pleading simply "will not do."

1

In their analysis of the procedural impact of the Oil Pollution Act ("OPA"), Plaintiffs get the analytical cart before the horse.   They argue pre-emption (Pls. Br., pp.6-13), before discussing what law might apply to their case (Pls. Br., pp. 13-26).   In most instances, it is necessary in the first place to determine whether or how a particular law applies before analyzing whether OPA preserves such an application of that law.

In particular, Plaintiffs suggest the application of Alabama law.   Pls. Br., p. 14.   Under the holdings in a series of Supreme Court decisions beginning with *Illinois v. Milwaukee*, 406 U.S. 91 (1970), however, a state's law *cannot* apply to water pollution originating outside the state.  This principle has particular applicability in this case.   State law simply does not apply of its own force to pollution originating from the seabed of the Outer Continental Shelf.   In this context, Plaintiffs attempted reliance on the state law savings provision of OPA § 2718, Pls. Br., pp. 6-7, is plainly misplaced.

Although Plaintiffs discuss maritime law at length, Pls. Br., pp. 15-21, Plaintiffs do not at any point dispute that their claims for economic loss are explicitly covered by the strict liability provisions of OPA § 2702(b), Cameron Br., pp. 4, 5.   And under the express terms of its maritime law savings provision, ***OPA does supplant any claims purportedly based in maritime law for the relief so provided in OPA.***   *See Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp.2d 741, 746-51 (E.D. La. 2009) (analyzing 33 U.S.C. § 2751(e)); Cameron Br., pp. 7-9. Plaintiffs do not even address, much less attempt to distinguish or dispute, the carefully reasoned decision in *Gabarick*. *See* Pls. Br., pp. 10-13.

Plaintiffs also discuss the Outer Continental Shelf Lands Act ("OCSLA") as a potential source of law for their claims.  Pls. Br., pp. 22-26; 43 U.S.C. § 1331 et seq.  Claims under

OCSLA, however, are necessarily based on federal law. OCSLA defined "a body of law applicable to the seabed" and "subsoil" of the OCS, and made clear "that this law was to be federal law . . . , applying state law only *as federal law*." *Rodrigue v. Atena Casualty & Surety Co.* 395 U.S. 352, 355-56 (1969) (emphasis added). Plaintiffs do not dispute that Congress intended OPA to be the sole federal law governing oil pollution liability and compensation. *See* Cameron Br., pp. 4-7. Plaintiffs do not cite any provision of OPA purporting to preserve claims based on federal law like OCSLA, because there is none. *See* Pls. Br., p. 13. Whether the interaction of the statutes is viewed as OPA supplanting OCSLA or as OCSLA requiring the application of OPA, the two statutes make clear that OPA is the only federal law that governs Plaintiffs' claims.

In conclusion, (a) claims under Alabama law do not apply to the facts of this case, making the state law savings provisions of OPA irrelevant; (b) the maritime savings provision of OPA by its own terms does not apply to matters covered by OPA, making maritime law unavailable for Plaintiffs' claims for economic losses; and (c) OPA supplants, or is made applicable by, OCSLA as the sole federal law governing Plaintiffs' claims. Plaintiffs do not claim that Cameron is an OPA responsible party. Plaintiffs' claims against Cameron should therefore be dismissed without prejudice, as the court held in *Gabarick*. Cameron Br., pp. 9-10.

### Plaintiffs Try to Sidestep *Twombley* and *Iqbal*

Plaintiffs quote a passage of the Supreme Court's decision in *Iqbal* recounting the Court's earlier holdings in *Twombly* concerning the pleading requirements of Federal Rule 8. Pls. Br., pp. 3-4, quoting *Ashcroft v. Iqbal* 129 S. Ct. 1937, 1949 (2009), quoting *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 555, 556, 557. However, Plaintiffs simply ignore those

requirements, asserting instead that "everybody in America" knows that "a defendant has acted unlawfully." Pls. Br., p. 4. There is, of course, no "everybody knows" exception to the requirements of Rule 8. Moreover, allegations against a single (unnamed) defendant do not permit naming other defendants unless Plaintiffs also satisfy Rule 8 with respect to each of the other defendants.

Notably, Plaintiffs do not attempt to counter Cameron's pointed showing that their Complaint contains nothing more than "labels" and "conclusions" or "formulaic" recitations of elements of purported causes of action. Cameron Br., p. 11. The Supreme Court has twice held that such conclusory allegations do not "suffice" under Federal Rule 8 because they tender "'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 129 S. Ct. at 1949, quoting *Twombley*, 550 U.S. at 557, quoted in Pls. Br., p. 3. Just as does their Complaint, however, Plaintiffs' Brief insists on a naked assertion of liability devoid of any factual enhancement, and never points to any well-pleaded "factual content" from which it could be inferred that Cameron (as distinguished from other Defendants) has any responsibility for the oil spill.

The Supreme Court has twice held that Rule 8 "demands more than an unadorned, the-defendant-unlawfully harmed me accusation." *Iqbal*, 129 S. Ct. at 1949, quoting *Twombley*, 550 U.S. at 555. Plaintiffs rest on their Complaint even though it plainly fails to satisfy this demand. The Court should not hesitate to grant Cameron's motion to dismiss under Rule 12(b)(6).

### The OPA State Law Savings Provision is Irrelevant

Citing generic conflicts of law principles, Plaintiffs argues that "Alabama substantive law would apply, *unless* Federal law requires a different result." Pls. Br., p. 14. Although it is never made clear, Plaintiffs seem to argue from this premise that either maritime law or OCSLA would

govern their claims in the absence of OPA.  *See* Pls. Br., pp. 15-26.  If that is Plaintiffs' argument, then they are correct.  Alabama state law does not apply because federal law is exclusively applicable to the facts of this case.

Out of an abundance of caution, however, Cameron feels it necessary to explain why Plaintiffs' initial idea that Alabama law might apply is wrong.  Alabama law could not and therefore would not apply of its own force to the facts of this case, which admittedly involve an oil spill from the seabed of the Outer Continental Shelf rather than a discharge within Alabama.

**1.    Alabama Law Could Not Apply to the Facts of This Case**

We begin our explanation with the Supreme Court's multistate water pollution cases.

a.    *The Multistate Water Pollution Cases*

In *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972), Illinois had sued four Wisconsin cities and two public authorities in Wisconsin for pollution of Lake Michigan, attempting to invoke the Court's original jurisdiction.  *Id.* at 93.  The Court rejected original jurisdiction, but held that federal question jurisdiction applied because interstate pollution "creates actions" necessarily "arising" under "federal common law."  *Id.* at 99.

As support, the Court quoted an earlier Tenth Circuit case for the proposition that "the ecological rights of a State in the improper impairment of them *from sources outside the State's own territory*" should be resolved as a matter of "*federal* common law."  406 U.S. at 100, quoting *Texas v. Pankey*, 441 F.2d 236, 240 (10th Cir. 1971) (emphasis added).  To explain why "federal law governs," 406 U.S. at 105 n.6, the Court again quoted the decision in *Texas v. Pankey*:

> ***Federal common law and <u>not the varying common law of the individual States</u> is***, we think, entitled and ***necessary to be recognized as a basis for dealing in***

> *uniform standard with the environmental rights of a State against improper impairment by sources outside its domain.* The more would this seem to be imperative in the present era of growing concern on the part of a State about its ecological conditions and impairments of them. In the outside sources of such impairment, more conflicting disputes, increasing assertions and proliferating contentions would seem to be inevitable. Until the field has been made the subject of comprehensive legislation or authorized administrative standards, *only a federal common law basis* can provide an adequate means for dealing with such claims as alleged federal rights.

*Id.* at 107, n.9, quoting *Texas v. Pankey*, 441 F.2d at 241-42 (emphasis added). In this context, the Court quoted its earlier holding that "[f]ederal interpretation of federal law will govern, *not state law.*" 406 U.S. at 103 n.5, quoting *Textile Workers Union v. Lincoln Mills of Alabama*, 353 U.S. 448, 457 (1957) (emphasis added).

On subsequent review of the same case in *Milwaukee v. Illinois*, 451 U.S. 304, 316-32 (1981), the Court held that provisions of the Federal Water Pollution Control Act (now the Clean Water Act) pre-empted the application of federal common law. In response to an argument that both federal and state common law could apply, the Court disagreed, stating bluntly that "*if federal common law exists, it is because state common law cannot be used.*" *Id.* at 313 n.7.

After further litigation in the same case, the Seventh Circuit held that the Clean Water Act pre-empted the application of Illinois law to pollution sources in Wisconsin. *Illinois v. Milwaukee*, 731 F.2d 402 (7th Cir. 1984), cert. denied, 469 U.S. 1196 (1985). The Supreme Court then reached the same conclusion in *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987). The Supreme Court quoted with approval the reasoning of the Seventh Circuit in the third *Milwaukee* case:

> For a number of different states to have independent and plenary regulatory authority over a single discharge would lead to chaotic confrontation between sovereign states.

6

*Id.* at 496, quoting *Illinois v. Milwaukee*, 731 F.2d at 414.   Accordingly, the Court held that despite its state law savings clause, the Clean Water Act "pre-empts state law to the extent that the state law is applied to an *out-of-state* point source." 497 U.S. at 500 (emphasis added).

In other words, these Supreme Court decisions all agree that in multistate water pollution cases, a state's common law cannot and thus does not apply to pollution originating outside the state.

### b.   *OCSLA in the Context of Supreme Court Authority*

Later in the same term as the second *Milwaukee* decision, the Court surveyed the principles governing federal common law in *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981).   "Absent some congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases." *Id.* at 641 (citations omitted).   As the Court explained, in "these instances, our federal system *does not permit the controversy to be resolved under state law either because the authority and duties of the sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control.*" *Id.* (emphasis added).

The reasoning and holdings of the Supreme Court in all these cases lead inescapably to the conclusion that federal law, *not state law*, necessarily applies to claims involving oil pollution originating from development activity on the Outer Continental Shelf.

i.   <u>The Authority and Duties of the United States Are Intimately Involved</u>

Oil development on the Outer Continental Shelf intimately involves "the authority and duties of the" United States within the meaning of *Texas Industries*.    In *United States v. California*, 332 U.S. 19 (1947), the Supreme Court rejected California's assertion of state sovereignty over the "three-mile belt" extending into the Pacific from the California coastline. The Court reasoned that the "ocean, even its three-mile belt, is of vital consequence to the nation in its desire to engage in commerce and to live in peace with the world..." *Id.* at 35. Three years later, the Court reiterated that the ocean

> is a national, not a state concern.  National interests, national responsibilities, national concerns are involved.  The problems of commerce, national defense, relations with other powers, war and peace focus there.  National rights must therefore be paramount in the area.

*States v. Louisiana*, 339 U.S. 699, 704 (1950).

In 1953, legislatively reversing the result of these "Tidelands" decisions, Congress passed the Submerged Lands Act.   43 U.S.C. § 1301, *et seq.*   The federal government effectively quitclaimed to the states its rights in, and to, all lands and natural resources lying under the ocean within three miles of their coasts.  *United States v. California*, 447 U.S. 1, 3 (1980).  Of course, this result was obtained by Congressional action; even with respect to the three-mile belt, state sovereignty still does not exist without federal legislative imprimatur.

Furthermore, in 1953, Congress enacted OCSLA, which explicitly "declared that the United States owned all submerged lands seaward" of the three-mile line.  *United States v. California*, 447 U.S. at 3; 43 U.S.C. §§ 1332(3), 1331(a).   In fact, OCSLA extends the civil laws of the United States to oil drilling "facilities" and "devices" that are "attached to" the OCS seabed as if the OCS were an area of "exclusive Federal jurisdiction."  43 U.S.C. § 1333(a)(1).

Accordingly, the Supreme Court has consistently held, based on its holdings in the Tidelands cases, that rights to the lands underlying the Outer Continental Shelf are an incident of national sovereignty, and that their control and disposition are the business of the federal government and not the states. *See, e.g.*, *United States v. Maine*, 420 U.S. 515, 522 (1975).

In this particular case, the pollution is the result of oil development operations pursuant to a lease of the federal government's property to one of the BP Defendants for the extraction of the federal government's resources. The authority and the duties and the rights of the federal government are therefore unquestionably involved. For that reason alone, as the Supreme Court has explained, our "federal system ***does not permit the controversy to be resolved under state law***." *Texas Industries*, 451 U.S. at 641 (emphasis added).

ii. Interstate and International Pollution Are Involved

In *Illinois v. Milwaukee*, the Court concluded that uniform federal common law necessarily governed pollution in Lake Michigan to the exclusion of state law because Lake Michigan—a navigable body of water entirely within the United States—is bounded by four states. The need for uniformity is even more compelling here. The Gulf of Mexico—an international body of water—is bounded by five states and several sovereign nations. Even more so than in the multistate pollution cases, therefore, the disputes in this case implicate the conflicting rights of multiple States, requiring the application of federal law.

The dispute also implicates "our relations with foreign nations." The United States is explicitly entitled to exercise control over the Outer Continental Shelf as a result of international law as confirmed by the United States Convention on the Law of the Sea. The involvement of foreign relations in these respects is yet another reason why it would be "***inappropriate for state***

*law to control*" this dispute.  *Texas Industries*, 451 U.S. at 641 (emphasis added); *see Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 389, 426 (1964).

        iii. <u>Conclusion</u>

Perhaps more than in any of the prior cases in which the Supreme Court concluded that federal law would govern to the exclusion of state law, the circumstance of this case require the application of federal common law in the absence of governing federal legislation.  As the Supreme Court put it succinctly, "if federal common law" applies, "it is because **state law cannot be used**."  *Milwaukee II*, 451 U.S. at  313 n.7.  Accordingly, no Alabama common law can apply to the facts of this case.

    **2.**      **OPA's State Law Savings Provisions Are Neither Relevant nor Applicable**

Since no state law can be applied to the facts of this case, OPA § 2718 is irrelevant. Moreover, read correctly, OPA § 2718 does not even purport to save any such (non-existent) state law.

There is no question that in OPA § 2718, Congress left the States some leeway to protect their own territory from oil pollution *originating* "within" their jurisdiction by allowing the States to impose "additional liability."  *See* 43 U.S.C. §§ 2718(a), (c), quoted in Pls. Br., p. 6. Nor is there any question that the Supreme Court recognized that intent in *United States v. Locke*, 529 U.S. 89 (2000), as Plaintiffs point out.  *See* Pls. Br., pp. 8-9.  But Plaintiffs do not adequately characterize the Supreme Court's decision in *Locke*.

The Supreme Court in *Locke* declined to apply OPA § 2718 to permit states to impose safety regulations on vessels, even those that operated within state waters, concluding that the provisions of the Ports and Waterways Safety Act ("PWSA") did pre-empt those state laws and

regulations. *Id.* at 112-16. The Court reasoned that the Washington state laws and regulations were enacted "in an area [regulation of interstate navigation and vessel safety] where the federal interest has been manifest since the beginning of our Republic and is now well established." *Id.* at 99. In this context, the Court interpreted OPA § 2718 narrowly, deciding that its provisions did not apply to permit state regulation of vessels. *Id.* at 104-07. The Court explicitly "decline[d] to give broad effect to savings clauses where doing so would upset the careful regulatory scheme established by federal law." *Id.* at 106. The Court explained that "[l]imiting the savings clauses as we have determined respects the established federal-state balance in matters of maritime commerce between the subjects as to which the States retain concurrent powers and those over which the federal authority displaces state control." *Id.*

With this understanding of the import of *Locke*, Cameron agrees with Plaintiffs that it would be important to read the actual language used in OPA § 2718 – if it were possible that state law could apply in this case. *See* Pls. Br., p. 7. In any event, the statute's precise language does not purport to save state law for oil discharges originating outside the state.

The only language addressing pre-emption in § 2718 appears in subsection (a)(1). 33 U.S.C. § 2718(a)(1)(A). It says that nothing in OPA (or other listed legislation) "shall (1) . . . be construed or interpreted as pre-empting, . . . any State . . . from imposing any additional liability or requirements with respect to – (A) the discharge of oil or other pollution by oil ***within such State* . . . .**" (Emphasis added.) This limiting phrase "within such state" makes clear Congress's intent to save only state laws relating to the physical discharge, spill, or release of oil pollution within the state's boundaries, including its territorial waters. The section does not purport to

save state laws that might seek to impose remedies for pollution migrating into that state from a discharge, spill, or release that did not occur "within such state."

Under the decision in *Locke*, only such a limited interpretation of OPA § 2718 would respect the "federal-state balance" that is established by the Submerged Lands Act and OCSLA and required by the Supreme Court's decisions in *Illinois v. Milwaukee* and *Ouellette*.  To the contrary, application of multiple state laws to a single discharge would be certain, within the meaning of *Locke*, to "upset the careful [compensation] scheme established by" OPA.

Not surprisingly, therefore, the cases on which Plaintiffs seek to rely – at Pls. Br., pp. 8-9 – all involve disputes in over activity or discharges *within a single state*.  *See Bouchard Transp. Co. v. Updegraff*, 147 F.3d 1344, 1347 (11th Cir. 1998) (collision in Tampa Bay); *Williams v. Potomac Electric Power Co.*, 115 F. Supp.2d 561, 562 (D. Md. 2000) (spill into marshland flowing into river); *National Shipping Co. v. Moran Mid-Atlantic Corp*, 924 F.Supp. 1436, 1440-42 (E.D. Va. 1996), aff'd w/o opinion, 122 F.3d 1062 (4th Cir. 1997), cert. denied, 523 U.S. 1021 (1998) (collision and spill in the Elizabeth River on a voyage upriver from Norfolk).  These cases have nothing to do with this case because the discharge at issue here occurred fifty miles from shore on seabed of the Outer Continental Shelf.  It should also be noted that the district court in *National Shipping* held that even under OPA § 2718, a negligent party could only bring a contribution claim pursuant to OPA § 2709, and could not assert a claim under state contribution law.  924 F. Supp. at 1446-49.

In summary, therefore, OPA § 2718 "saves" or "preserves" the application of state laws that may apply to oil pollution *wholly within* state inland and coastal waters.  But it neither *saves nor creates* state law to govern activity on the Outer Continental Shelf where no state law has

12

ever existed or could ever exist. Accordingly, Alabama law cannot and does not govern Plaintiffs' claims.

### The OPA Maritime Savings Clause Does Not Preserve Claims Covered by OPA

Plaintiffs' lengthy discussion of the potential application of maritime law to the disputes in this case is largely immaterial. *See* Pls. Br., pp. 15-23.[a] Plaintiffs do not dispute Cameron's observation that the strict liability of the responsible parties under OPA § 2702(a) encompasses all the economic loss damages claimed by Plaintiffs in the Complaint by reason of OPA §§ 2702(b)(2)(A) (C), (E). Cameron Br., pp. 4-5. To repeat, Plaintiffs are entitled to recover all the legitimate damages that they are claiming in the Complaint under express provisions of OPA – all they have to do is comply with the statute and submit a claim. 33 U.S.C. § 2713(a). Plaintiffs wisely do not argue otherwise. In this context, however, the maritime law savings clause unambiguously *does not preserve* a maritime law claim for these damages covered by OPA.

Once again, Cameron completely agrees with Plaintiffs that we should "go to the statute." Pls. Br., p. 10 (citation omitted). But again, we need to do what Plaintiffs say, and not what Plaintiffs do. For Plaintiffs never go to the whole statute or its entire legislative history. *See* Cameron Br., pp. 4-7. Most important of all, Plaintiffs evade the key language in the statute. *See* Pls. Br., pp. 10-13.

In its maritime law savings provision, OPA contains an important qualifier. The statute unambiguously states that maritime law is preserved "[e]xcept as otherwise provided in this Act." 33 U.S.C. § 2751(e), quoted in Pls. Br., p. 9. Judge Lemelle gave this language careful

---

[a] Notably, Plaintiffs do not explain how they could have a maritime claim against Cameron for the sale of equipment that was attached to the Outer Continental Shelf seabed when the alleged casualty occurred.

consideration in his comprehensive decision holding that OPA precludes maritime claims for economic losses in *Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp.2d 741, 746-51 (E.D. La. 2009). As Judge Lemelle concluded after a careful review of all the applicable provisions of OPA and all of its legislative history, "the plain language of the statute indicates its mandatory and exclusive nature with respect to its covered damages." *Id.* at 746. No other reading of the maritime savings clause is possible. If claimed damages are covered by OPA, then their recovery is "otherwise provided in this Act," so that the maritime law savings clause does not preserve any right to recover of those covered damages under maritime law.

Plaintiffs' efforts to rely on prior cases discussing the maritime law savings clause is singularly unavailing. *See* Pls. Br., pp. 10-13. In her district court decision concerning removal under OPA, now Fifth Circuit Judge Clement concluded that the OPA liability and compensation "scheme includes new remedies, which, in many respects, preempt traditional maritime remedies." *Tanguis v. M/V Winchester*, 153 F. Supp.3d 859, 867 (E.D. La. 2001). Judge Clement pointed out that this "result is reflected" in the "except as otherwise provided in this chapter" language of the maritime law savings clause, which she highlighted. *Id.* Judge Clement then repeated that "*the first subsection of the admiralty and maritime law savings clause recognizes that certain maritime remedies are preempted by OPA*, while others survive." *Id.* (emphasis added and citation omitted).

The district court decisions in *Gabarick* and *Tanguis* are likewise fully supported by the First Circuit's decision in *In re Metlife Capital Corp.*, 132 F.3d 818 (1st Cir. 1997), quoted in Pls. Br., p. 12. In that case, the First Circuit held that OPA implicitly repealed the maritime "Limitation Act as to oil spill pollution claims arising under OPA." 132 F.3d at 822. In other

words, OPA did supplant this important maritime law "as to oil spill pollution claims under OPA." Only in this context, therefore, did the court note that under OPA maritime law savings clause, the maritime Limitation Act "remains in force for general maritime claims such as maritime tort actions for harms to persons or vessels." 132 F.3d at 822, quoted in Pls. Br., p. 12. The maritime savings clause, therefore, permitted maritime remedies only for such "non-OPA claims." 132 F.3d at 823, quoted in Pls. Br., p. 12. *See also National Shipping Co. v. Moran Mid-Atlantic Corp*, 924 F. Supp. 1436, 1453-54 (E.D. Va. 1996), aff'd w/o opinion, 122 F.3d 1062 (4th Cir. 1997), cert. denied, 523 U.S. 1021 (1998) (oil spill damage claims governed by OPA; collision damage claims governed by maritime law).

Plaintiffs do not assert any "non-OPA claims," for personal injury or other maritime-related relief. All of their claims are oil pollution economic loss claims expressly covered under OPA. Even under the authority cited by Plaintiffs, therefore, it is clear that because OPA covers all of Plaintiffs claims, the OPA maritime law savings clause would not preserve the application of maritime law in this case.

## OPA Does Not Preserve Oil Spill Economic Loss Claims Arising Under OCSLA

Plaintiffs' discussion of the potential application of state law by reason of the choice of law provision of OCSLA is to some degree immaterial. *See* Pls. Br., pp. 22-26.[b]  Of key

---

[b] Plaintiffs argue that Alabama law could be the "adjacent" state law "borrowed" under the choice of law provision in OCSLA, 43 U.S.C. § 1333(a)(2). *See* Pls. Br., pp. 25-26. They are patently incorrect. As Plaintiffs note, the Court is entitled to take judicial notice of a map of the Gulf, and could readily take the coordinates of the Macondo well, and determine as a matter of law what state is the "adjacent" state within the meaning of OCSLA. If the Court did so, the Court would see that the well site is 50 miles "seaward" of the east coast of Louisiana, whereas the Mississippi and Alabama coastlines are perhaps twice as far away. Applying the "seaward" measure required by OCSLA, therefore, Louisiana law is plainly the law that would be borrowed under the choice of law provision of OCSLA. Plaintiffs' idea of measuring "straight south" is plainly contrary to the statutory language. *See* Pls. Br., p. 25. However, because OPA rather than OCSLA applies to Plaintiffs' claims, this would be an empty exercise in this case.

importance is the operative language of OCSLA. In the context of that language, however, Plaintiffs' argument that OPA does not supplant or pre-empt application of OCSLA to their claims necessarily fails. *See* Pls. Br., p. 13.

As noted previously, the primary choice of law provision of OCSLA extends the "laws" of the "United States" to oil and gas operations involving "facilities" and "devices" attached to the OCS seabed and subsoil as if the seabed and subsoil "were an area of exclusive Federal jurisdiction." 43 U.S.C. § 1333(a)(1). All federal law, therefore, applies directly to the facts in this case, which unquestionably involve facilities and devices attached to the OCS seabed to produce oil from the OCS subsoil.

Only secondarily, however, does OCSLA also provide for borrowing "adjacent" state law. 43 U.S.C. § 1333(a)(2), quoted in Pls. Br., p. 22. Under subsection (2), moreover, any borrowed state law may "not" be "inconsistent" with "Federal laws" that are "hereafter adopted," and as Plaintiffs themselves highlight, such adjacent state laws "are declared to be the law of the United States of that portion of the subsoil and seabed of the Outer Continental Shelf."

The Supreme Court definitively interpreted these provisions in *Rodrigue v. Aetna Casualty & Surety Co.* 395 U.S. 352 (1969). The Court first explained that the "purpose of [OCSLA] was to define a body of law applicable to the seabed, the subsoil, and the [attached facilities and devices] such as those in question here on the outer Continental Shelf. *Id.* at 355 (the "attached facilities and devices" language was added to subsection (1) in 1978, after the Court's decision). The Court then emphasized that this entire body of law was federal law. "That this law was to be federal law of the United States, applying state law only as federal law and then only when not inconsistent with applicable federal law is made clear by the language of

the Act." *Id.* at 355-56.  Reciting the key language of subsection (a)(1), the Court explained that "[s]ince federal law, because of its limited function in a federal system, might be inadequate to cope with the full range of potential legal problems, the Act supplemented gaps in the federal law with state law through the 'adoption of State law as the law of the United States.'" *Id.* at 356-57.  Borrowed state law, therefore, was designed as a "gap-filler" and was adopted "as federal law."  Accordingly, Congress's conclusion was that "federal law should prevail, and that state law should be applied only as federal law, and then only when no inconsistent federal law applied." *Id.* at 358.

At issue in the case was the potential application of the Death on the High Seas Act to a fatal accident during oil production on the Outer Continental Shelf.  Based on its analysis of the OCSLA choice of law provisions, the Court noted "that in view of the inconsistencies between the state law and the Seas Act, the Seas Act remedy would be exclusive if it applied." *Id.* at 359.

Under this definitive reading of OCSLA by the Supreme Court, there is no basis for resort to OCSLA or borrowing state law as federal law to apply to the liability and compensation regime established by OPA.

As the OPA legislative history makes clear, Congress intended OPA to be the "single federal law" governing oil spill liability and compensation." *See* Cameron Br., pp. 4-5.  OPA does preserve some state law in § 2718, and does preserve some maritime law in § 2751(e), but nothing in OPA preserves any other federal law.  Accordingly, the mandatory and exclusive language of OPA necessarily supplants OCSLA and every other federal law with respect to the economic damages claims covered by OPA.

The same result would be reached under the provisions of OCSLA itself.   OCSLA extends federal law to the Outer Continental Shelf.   By the express terms of both OPA and OCSLA, OPA is federal law applicable on the Outer Continental Shelf.   OPA comprehensively covers the economic loss claims asserted by Plaintiffs, and was intended by Congress to be the single federal law governing oil spill liability and compensation.   There is therefore no gap in federal law to be filled by borrowing state law under OCSLA.   Indeed, applying adjacent state law under OCSLA would be inconsistent with OPA within the meaning of OCSLA.   Therefore, because OPA *does* apply to Plaintiffs' claims, the OPA remedy *is* "exclusive" under OCSLA and the reasoning of the Supreme Court in *Rodrigue*.

Viewed from the perspective of either statute, OPA is the exclusive federal law applicable to Plaintiffs' claims for economic losses caused by an oil spill.   OPA does not preserve any claim for economic losses caused by oil spills under OCSLA or its state law borrowing provision.

### The *Gabarick* Reasoning Applies in This Case

Alabama law does not apply of its own force, and state law application to the facts of this case would not be saved in any event by the provisions of OPA preserving state law solely for application to discharges "within" a state.   As Judge Lemelle held in the authoritative *Gabarick* decision, any maritime law applicable to Plaintiffs' claims are not preserved by OPA's maritime law savings clause because OPA "otherwise" provides for those claims.   OPA does not preserve OCSLA-based claims for oil spill economic damages, whereas OCSLA requires application of OPA for recovery of those damages.

18

As a matter of law, therefore, Plaintiffs' claims should be dismissed without prejudice as in *Gabarick*.

## Conclusion

Although Plaintiffs do not admit it outright, they do "fully understand" that they are asking this Court to rule inconsistently with *Gabarick*. *See* Pls. Br., p. 12. In the end, however, Plaintiffs provide the Court with no good reason to depart from the *Gabarick* result. Accordingly, if the Court does not dismiss Plaintiffs' Complaint with prejudice under *Twombley* and *Iqbal*, then it would be entirely proper for the Court to grant a dismissal without prejudice under *Gabarick*.[c]

Notably, however, Plaintiffs also argue that it is "too early" in the case to be resolving the choice of law issues they raise. *See* Pls. Br., pp. 14, 17, 26. Cameron disagrees, because the purely legal issue of the preclusive effect of OPA's liability and compensation provisions can and should be resolved on the basis of a dismissal motion.

On the other hand, Cameron would second an idea implicit in Plaintiffs' comments – namely, that that there is no good reason for this Court to be addressing any of these purely legal issues. As noted, Cameron has moved for a stay of this case pending a decision by the Judicial Panel on Multidistrict Litigation. (Doc. 59.) The MDL judge appointed to handle this and other related cases should be allowed to resolve these legal issues on a uniform basis in the hundreds of cases in which the issues will arise. It would therefore be a wise use of judicial resources for this Court to delay resolution of Cameron's motion pending a transfer decision by the Panel.

---

[c] Cameron respectfully submits that Plaintiffs' counsel have not, and could not, offer any good reason why the best interests of Plaintiffs would not be served by their filing a claim under OPA with the independent claims administrator handling the $20 billion fund created by BP. Recovery by Plaintiffs from the fund would obviate the need for this lawsuit – Congress obviously meant to obviate the need for such lawsuits when it enacted OPA.

Respectfully submitted,

David J. Beck (*pro hac vice*)
BECK, REDDEN & SECREST, L.L.P.
One Houston Center
1221 McKinney Street, Suite 4500
Houston, Texas 77010
Telephone:     (713) 951-3700
Facsimile:     (713) 951-3720
dbeck@brsfirm.com

Randal H. Sellers (SELLR3398)
M. Warren Butler (BUTLM3190)
Bryan G. Hale (HALEB6964)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, Seventh Floor
Birmingham, Alabama 35209
Telephone:     (205) 868-6000
Facsimile:     (205) 868-6099
rhs@starneslaw.com
mwb@starneslaw.com
bgh@starneslaw.com

*/s/ A. Danner Frazer, Jr.*
A.  Danner Frazer (FRAZA9809)
Ross A. Frazer (FRAZR7422)
Robert J. Mullican (MULLR1788)
FRAZER, GREENE, UPCHURCH
  & BAKER, L.L.C.
107 St. Francis Street, Suite 2206
Mobile, Alabama 36602
Telephone:     (251) 431-6020
Facsimile:     (251) 431-6030
adf@frazergreene.com
rjm@frazergreene.com

*Attorneys for Cameron International
Corporation*

20

## CERTIFICATE OF SERVICE

I hereby certify that I have on July 23, 2010 electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF System which will automatically serve the same via electronic mail or by placing same in the United States mail, properly addressed, first class postage prepaid to the following:

Steve Olen, Esquire
Lucy E. Tufts, Esquire
Robert T. Cunningham, Jr., Esquire
Steven L. Nicholas, Esquire
CUNNINGHAM, BOUNDS, LLC
Post Office Box 66705
Mobile, Alabama 36660

George R. Irvine, III, Esquire
STONE, GRANADE & CROSBY, P.C.
7133 Stone Drive
Daphne, Alabama 36526

David A. Bagwell, Esquire
Post Office Box 2126
Fairhope, Alabama 36533

*Attorneys for Plaintiffs*

William H. Brooks, Esquire
Marcello Dewaun Gray, Esquire
LIGHTFOOT, FRANKLIN & WHITE, LLC
400 North 20th Street
Birmingham, Alabama 35203

James Andrew Langan, Esquire *Pro Hac Vice*
John T. Hickey, Esquire *Pro Hac Vice*
Richard C. Godfrey, Esquire *Pro Hac Vice*
KIRKLAND & ELLIS, LLP
300 N. LaSalle
Chicago, Illinois 60654

*Attorneys for BP Exploration & Production, Inc., BP America, Inc. and BP Products North America, Inc.*

Blane H. Crutchfield, Esquire
Douglas L. McCoy, Esquire
HAND ARENDALL, LLC
Post Office Box 123
Mobile, Alabama 36601

*Attorneys for Transocean Offshore Deepwater Drilling, Inc. and Transocean Deepwater, Inc.*

John N. Leach, Jr., Esquire
Joseph P. H. Babington, Esquire
Russell C. Buffkin, Esquire
HELMSING, LEACH, HERLONG, NEWMAN & ROUSE, P.C.
Post Office Box 2767
Mobile, Alabama 36652

Bruce W. Bowman, Jr., Esquire
Donald E. Godwin, Esquire
Jenny L. Martinez, Esquire
GODWIN RONQUILLO PC
1201 Elm Street, Suite 1700
Dallas, Texas 75270

Robert Alan York, Esquire
GODWIN RONQUILLO PC
1331 Lamar, Suite 1665
4 Houston Center
Houston, Texas 77010

*Attorneys for Halliburton Energy Services, Inc.*

s/ A. Danner Frazer, Jr.
Of Counsel